[No. D040627. Fourth Dist., Div. One. Dec. 17, 2003.]

PADRES L.P., Plaintiff and Respondent, v.
J. BRUCE HENDERSON, Defendant and Appellant.

500

## Counsel

Roy B. Cannon and Stephen M. Hogan for Defendant and Appellant.

Gray, Cary, Ware & Freidenrich, Kathryn E. Karcher and Mark C. Zebrowski for Plaintiff and Respondent.

Sheppard, Mullin, Richter & Hampton, Timothy B. Taylor and Karin Dougan Vogel for San Diego Regional Chamber of Commerce as Amicus Curiae on behalf of Plaintiff and Respondent.

## Opinion

**McINTYRE, J.**—Padres L.P., the owner of the San Diego Padres Major League Baseball Team (the Padres), sued Attorney J. Bruce Henderson for malicious prosecution arising out of a series of lawsuits he filed challenging actions taken by the City of San Diego (the City), in collaboration with the Padres, to develop a new baseball park. Henderson appeals the partial denial of his special motion to strike the Padres' malicious prosecution claims pursuant to Code of Civil Procedure section 425.16 (commonly known as the anti-SLAPP statute). (All statutory references are to the Code of Civil Procedure unless otherwise specified.) He contends that, in accordance with *City of Long Beach v. Bozek* (1982) 31 Cal.3d 527, 534 [183 Cal.Rptr. 86, 645 P.2d 137] (*Bozek*), judgment vacated and cause remanded (1983) 459 U.S. 1095 [74 L.Ed. 2d 943, 103 S.Ct. 712], reiterated (1983) 33 Cal.3d 727, 728 [190 Cal.Rptr. 918, 661 P.2d 1072], he was absolutely privileged to file the underlying actions and thus the Padres cannot sue him for malicious prosecution. He also argues that, to the extent their claims are not otherwise barred, the Padres did not meet their statutory burden of showing a probability of success on their malicious prosecution causes of action. We find that no absolute privilege applies to Henderson's filing of the underlying actions, but agree that the Padres have not made the requisite showing of lack of probable cause in support of two of their three malicious prosecution claims. We reverse the trial court's order as to those causes of action, but affirm it as to the remaining claim.

### FACTUAL AND PROCEDURAL BACKGROUND

Much of the factual and procedural background is taken from this court's unpublished opinions in the prior actions involving the City, the Padres and Henderson.

Since 1967, the City has owned and operated Qualcomm Stadium (formerly, Jack Murphy Stadium and originally San Diego Stadium) as the home field for the San Diego Chargers National Football League football team;

since 1969, the stadium has also been the home field for the Padres. In 1996, the City established a task force to determine whether the Padres needed its own ballpark in order "to have the opportunity to remain competitive and to become financially stable" and, if so, whether the City should participate in its development. In 1997, after the task force answered both questions in the affirmative, the City formed another task force to recommend a site and financing alternatives for a new baseball ballpark. "[I]n January of 1998[,] the task force issued a report recommending . . . that the proposed new facility be part of a larger redevelopment effort in downtown San Diego, in order to obtain the benefits of redevelopment." The City and the Padres began negotiations for the construction of a ballpark and redevelopment of the surrounding area.

In early August 1998, the City enacted an election ordinance placing an initiative known as Proposition C on the November 1998 ballot. Proposition C called for the City to enter into a memorandum of understanding (MOU) and related agreements with the Padres and certain other agencies regarding a redevelopment project, including the construction of a ballpark, in the Centre City East area of downtown. (*City of San Diego v. Dunkl* (2001) 86 Cal.App.4th 384, 388–390 [103 Cal.Rptr.2d 269] (*Dunkl*).)

Shortly after the passage of the election ordinance, Henderson filed a petition for writ relief and complaint for declaratory and injunctive relief against the City, the Padres and others on behalf of Jerry Mailhot (*Mailhot v. Abdelnour* (Super. Ct. San Diego County, 1998, No. GIC723318) (*Mailhot I*)). The petition alleged that Proposition C, the MOU and the ballot materials contained misleading statements; that Proposition C violated the California Constitution by conferring rights and imposing duties on a private entity; that Proposition C violated the California Constitution's and the San Diego City Charter's (City Charter) "one subject" rule; that a vote on Proposition C was premature because the City had not prepared or certified an environmental impact report (EIR) for the project as required under the California Environmental Quality Act (Pub. Resources Code, § 21000 et. seq. (CEQA)); and that, pursuant to the City Charter, a two-thirds vote was required to pass Proposition C because the City's financial obligations thereunder constituted a debt for the 1998–1999 fiscal year exceeding the City's available resources. The court denied Henderson's writ petition in its entirety in September 1998 and entered judgment on November 9, 1998. Henderson noticed an appeal from the judgment.

In the November 1998 election, the voters approved Proposition C by a 60 percent to 40 percent margin and thereafter the City, the Padres and certain redevelopment agencies executed the MOU. (*Dunkl, supra,* 86 Cal.App.4th at p. 389.) The MOU provided that the City's financial contribution toward the

ballpark project would be capped at $225 million, with the Padres responsible for contributing $115 million and amounts needed to cover any ballpark cost overruns. The MOU included a number of matters requiring the City's subsequent approval, including issues relating to parking facilities and infrastructure and the Padres' provision of sufficient assurances regarding ancillary development. (*Id.* at p. 390.) The MOU was also conditioned on the City's ability to obtain financing for its $225 million contribution on reasonably acceptable terms, on a fully tax-exempt basis. (*Ibid.*)

In February 1999, the City Council passed an ordinance amending the annual appropriation ordinance it had previously adopted for fiscal year 1998–1999. The amendment established a capital improvements program, appropriated $225 million for the ballpark project and authorized the transfer of $3,500,000 to the capital improvements program as interim funding ($225 Million Appropriation Ordinance). At the time, the City made a finding that its adoption of the ordinance was not a "project" subject to the requirements of CEQA.

In March 1999, Henderson filed a second action on Mailhot's behalf against the City, the Padres and others (*Mailhot v. City of San Diego* (Super. Ct. San Diego County, 1999, No. GIC728676) (*Mailhot II*)). This action sought to invalidate the $225 Million Appropriation Ordinance on the grounds that the adoption of the ordinance (1) constituted a "project" under CEQA requiring the preparation of an environmental impact report (EIR) and/or (2) was an improper midyear amendment of the previously adopted annual appropriation ordinance and violated the City Charter's "balanced budget" requirements.

In July 1999, the City Council adopted its annual appropriation ordinance for fiscal year 1999–2000 (1999 Annual Appropriation Ordinance), which set forth the City's budget for its 1999–2000 fiscal year. The City's budget contained an executive summary of revenues and expenditures, which included estimated revenues for the project of $225 million from "Lease Revenue Bonds" and the previously appropriated $225 million as a "special project" expenditure.

In August 1999, the superior court denied Henderson's requests for relief in *Mailhot II*, finding (1) the action for an alleged CEQA violation was not properly filed under the validation statutes; (2) the $225 Million Appropriation Ordinance did not violate the City Charter; (3) the third cause of action for a writ of mandate was rendered moot by *Coalition Advocating Redevelopment Excellence v. City of San Diego* (Super. Ct. San Diego County, 1999, No. GIC730641) (the *Coalition* action)), in which the court enjoined further work on the ballpark project pending the preparation of an EIR; and (4)

Henderson's contention that the appropriation required a two-thirds vote of the electorate was not properly raised in his pleadings and therefore could not be considered. Henderson noticed an appeal from the resulting judgment.

While *Mailhot II* was pending in the superior court, this court affirmed the judgment in *Mailhot I* in an unpublished opinion. The decision held that the MOU's provisions requiring the City to invest $225 million in the project did not constitute a "debt" requiring a two-thirds vote and that the act of placing Proposition C on the ballot was not a "project" as defined by CEQA and thus did not require the preparation of an EIR. (*Mailhot v. Abdelnour* (July 23, 1999, D032123) [nonpub. opn.].) Shortly thereafter, the City certified an EIR for the ballpark project.

In August 1999, Henderson filed a third action against the City, the Padres and others on Mailhot's behalf, seeking to invalidate the 1999 Annual Appropriation Ordinance insofar as it appropriated $225 million for the ballpark project (*Mailhot v. City of San Diego* (Super. Ct. San Diego County, 1999, No. GIC734367) (*Mailhot III*)). In his complaint, Henderson alleged that the appropriation violated certain City Charter provisions, including section 99, and CEQA.

In November 1999, Michael Kane Dunkl and Philip Zoebisch filed a notice of intent to circulate an initiative petition. If adopted by the voters, the initiative (the Proposition C initiative) would have made findings that certain conditions required by Proposition C had failed, would have terminated the City's contingent obligations under the MOU and would have imposed a two-thirds voter approval requirement before the City could reinstate or incur similar obligations. (*Dunkl, supra,* 86 Cal.App.4th at pp. 388, 390–391.) In January 2000, the City and the Padres filed declaratory relief actions alleging that the Proposition C initiative was invalid and should not be placed on the ballot. (*Id.* at p. 388.) Henderson represented Dunkl and Zoebisch in the coordinated actions. (See *id.* at pp. 388, 396, 402.)

Also in January 2000, the City enacted an ordinance authorizing the issuance of $299 million in lease revenue bonds to finance and fund its contribution to the ballpark project (the Bond Ordinance). A month later, Henderson filed an action against the City, the Padres and others on behalf of Steven J. Currie (*Currie v. City of San Diego* (Super. Ct. San Diego County, 2000, No. GIC743443) (*Currie*)), seeking a writ of mandate and asserting a claim for declaratory relief to invalidate the Bond Ordinance. The action alleged that the Bond Ordinance exceeded Proposition C's $225 million cap on the City's investment in the ballpark project and violated the 1999 Annual Appropriation Ordinance and the City Charter's balanced budget requirement because the expenditure would exceed the authorized budget for that year. It

also argued certain conditions subsequent required by Proposition C had not been met and that the Padres had not made certain disclosures required under City Charter section 225.

In February 2000, the trial court granted summary judgment motions by the City and the Padres in their action challenging the Proposition C initiative. It ruled that the factual findings set forth in the proposed initiative were of the type normally made by a governmental agency in an administrative decision, and because those findings were administrative rather than legislative in nature, they were not proper subjects for determination by initiative. (*Dunkl, supra*, 86 Cal.App.4th at p. 393.)

On March 1, 2000, Henderson and Zoebisch appeared at the city clerk's office to place a referendum on the ballot to repeal the Bond Ordinance or submit its terms to the voters (the Bond Ordinance initiative). Despite the fact that this was the last date to submit matters for inclusion on the ballot, the men left the office without leaving the referendary petitions with the city clerk after being advised that the clerk would accept the petitions only provisionally, subject to verification of validity. Henderson and Zoebisch continued to collect signatures thereafter. Within a week, Henderson filed an action on Zoebisch's behalf (*Zoebisch v. Abdelnour* (Super. Ct. San Diego County, 2000, No. GIC44483) (*Zoebisch*) )against the city clerk, the City, the Padres and others, alleging that the Bond Ordinance initiative was valid and properly submitted, thus requiring its placement on the ballot.

In late March 2000, the trial court rejected Henderson's contentions in *Currie* and granted the City's motion for summary judgment (in which the Padres joined) in that action. It found that the Bond Ordinance did not exceed the funding cap referenced in Proposition C and the MOU because the cap was not intended to include costs of obtaining financing. It also held that because the ballpark would not be completed during the 1999–2000 fiscal year, the City's $225 million contribution would not have to be paid in its entirety during that year and thus did not violate the balanced budget requirement. The court also concluded that City Charter section 225 was not applicable to the Padres and thus no disclosure was required. It rendered judgment in favor of the defendants on all of Currie's claims and again Henderson appealed.

Shortly thereafter, the superior court granted the City's motion for summary judgment (in which the Padres joined) in *Mailhot III*. The court found that (1) the $225 million annual appropriation in the 1999 Annual Appropriation Ordinance was not a "project" subject to CEQA; (2) the action was not properly the subject of a validation claim; and (3) the complaint did not plead a claim that the appropriation violated the terms of the MOU and therefore

such a claim was barred. It entered judgment in favor of the City and the Padres. Henderson filed an appeal from the judgment.

In May 2000, the trial court granted summary judgment in favor of the named defendants in *Zoebisch*. The court found that the proposed Bond Ordinance initiative was invalid because it involved administrative acts and that the supporting petitions were not timely submitted.

In August 2000, Henderson filed a complaint on behalf of Mailhot and Bruce Skane (*Skane v. City of San Diego County,* 2000, No. GIC752505) (*Skane*)) against the City, the Padres and others, alleging that the City's business transactions with the Padres were void due to prohibited conflicts of interest involving gifts made by the Padres or its affiliates to members of the City Council, that the City's obligations under Proposition C and the MOU had expired pursuant to their own terms and that a resolution authorizing $10 million in interim financing for the ballpark project was invalid under the City Charter. The *Skane* complaint also alleged that the Padres had violated the Cartwright Act and the Racketeering Influenced and Corrupt Organizations Act (RICO) and had committed unfair business practices. In October and November 2000, Henderson recorded three lis pendens against property that was being acquired for the ballpark project, based on the *Skane* lawsuit.

In January 2001, the trial court in *Skane* sustained without leave to amend the Padres' demurrers to the Cartwright Act, RICO and unfair business practice claims on the ground that those claims were barred by the *Noerr-Pennington* doctrine (*Eastern R. Conf. v. Noerr Motor* (1961) 365 U.S. 127 [5 L.Ed.2d 464, 81 S.Ct. 523]; *Mine Workers v. Pennington* (1965) 381 U.S. 657 [14 L.Ed.2d 626, 85 S.Ct. 1585]). The court granted a motion to expunge Henderson's lis pendens because the *Skane* complaint did not affect the title to or possession of the real property and awarded the City and the Padres reasonable attorney fees and costs incurred in bringing the motion, implicitly finding that the lis pendens had been filed without substantial justification (see Code Civ. Proc., § 405.38). In August 2001, the court entered judgment in favor of the Padres. Henderson noticed an appeal from the trial court's rulings.

In November 2000, this court affirmed the judgment in *Mailhot II*. (*Mailhot v. City of San Diego*, D034827, 2000 [nonpub. opn.].) We held that although Mailhot's claims were not procedurally barred because they were brought as a "validation" action, his challenge to the lack of an EIR was moot in light of the City's certification of an EIR for the project. Concluding that Mailhot's challenge to the $225 Million Appropriation Ordinance as violative of the City Charter was "essentially the same argument" raised in *Mailhot I*, we held that there was "no meaningful difference" between the MOU's appropriation provision and the appropriation itself for purposes of applying the

City Charter's supermajority vote requirement and that, based on the rejection of the argument in *Mailhot I*, Henderson was collaterally estopped to raise it again. Finally, the decision held that the mid-year appropriation was not an improper amendment to the City's 1999 Annual Appropriation Ordinance.

In January 2001, this court affirmed the trial court's granting of summary judgment in favor of the City and the Padres in their action challenging the Proposition C initiative. We concluded that Proposition C and the MOU constituted legislative acts establishing policy for the City, and conferred on the City the authority to implement the MOU by necessary and appropriate administrative and nonlegislative acts. (*Dunkl, supra,* 86 Cal.App.4th at pp. 390, 402.) Noting that Proposition C authorized the City to amend or modify the agreements "as determined by the [C]ity council to be in the best interests of the City, subject to the criteria that the rights of the City shall not be decreased and its obligations not increased," we held that the determination of whether certain conditions set forth in Proposition C had been satisfied was an administrative determination vested in the City and, as such, those determinations could not be overturned by a proposed voter initiative. (*Id.* at pp. 399–402.)

Also in January 2001, this court rejected Henderson's appeal in *Mailhot III* insofar as he argued that the 1999 Annual Appropriation Ordinance violated certain provisions of the MOU since the complaint in that action did not include allegations of such violations. (*Mailhot v. City of San Diego* (Jan. 18, 2001, D035504) [nonpub. opn.].) We also dismissed as moot Henderson's appeal challenging the City's failure to certify an EIR prior to adopting the 1999 Annual Appropriation Ordinance "for the same reasons as we did in our unpublished decision in the appeal in *Mailhot II.*"

In March 2001, this court affirmed the trial court's judgment in *Zoebisch* on the ground that the referendum petitions had not been timely filed in accordance with the San Diego Municipal Code. (*Zoebisch v. Abdelnour* (Mar. 9, 2001, D035872) [nonpub. opn.].) The same month, we affirmed the judgment in *Currie* on substantive and procedural grounds, noting that the prior appellate decision in *Dunkl* had addressed "some similar substantive issues" as those raised by *Currie*. (*Currie v. City of San Diego* (Mar. 28, 2000, D035891) [nonpub. opn.].) We found that the Bond Ordinance did not violate the MOU or Proposition C, both of which contemplated that the City would finance its contribution toward the project construction but did not specify that financing costs were included within the spending cap. We also concluded that the Bond Ordinance did not obligate the City to expend more than $225 million in fiscal year 1999–2000 in violation of the 1999 Annual Appropriation Ordinance, that under Proposition C and the MOU it was up to

the City to determine whether the Proposition C conditions subsequent had been met and that later changes in circumstances did not invalidate the City's determination that the conditions had been met at an earlier time. Finally, we found that neither City Charter section 225 nor the MOU required the Padres to make the disclosures sought by Henderson. In addition to affirming the trial court's substantive determinations, we also affirmed its decision on procedural grounds.

The Padres filed this action against Henderson in January 2002, and shortly thereafter Henderson filed an appellate brief in *Skane*, abandoning his appeal relating to the trial court's rulings on his Cartwright Act, RICO and unfair business practice claims against the Padres. In April 2002, Henderson brought a special motion to strike the Padres' malicious prosecution claims. The Padres opposed the motion, except as to their claim based on *Mailhot II*, which they conceded was time-barred.

The trial court denied the anti-SLAPP motion except as to the causes of action based on *Mailhot II* and *Skane*, as to which Henderson's appeal of the trial court's rulings on his claims against the City was still pending. After the entry of judgment in this case, this court affirmed the challenged trial court rulings in *Skane*.

## DISCUSSION

■ Section 425.16, subdivision (b)(1) provides in relevant part that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." The purpose of the statute is to encourage participation in matters of public significance by allowing a court to promptly dismiss unmeritorious actions or claims that are brought to chill another's valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. (*Id.*, subd. (a).) In furtherance of this purpose, the anti-SLAPP statute is to be construed broadly. (*Ibid.*; *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1130 [104 Cal.Rptr.2d 377, 17 P.3d 735].)

■ A defendant bringing an anti-SLAPP motion to strike must make a prima facie showing that the plaintiff's suit is subject to section 425.16, i.e., that the defendant's challenged acts were taken in furtherance of his constitutional rights of petition or free speech in connection with a public issue, as defined by the statute. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728 [3 Cal.Rptr.3d 636, 74 P.3d 737].) If the defendant makes such a

showing, the burden shifts to the plaintiff to demonstrate, by admissible and competent evidence, a reasonable probability that it will prevail on the merits at trial. (§ 425.16, subd. (b)(1); *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 567–568 [92 Cal.Rptr.2d 755].) The plaintiff must make a prima facie showing of facts that would be sufficient to sustain a favorable judgment under the applicable evidentiary standard. (*Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 358 [42 Cal.Rptr.2d 464] [where an element of a claim must be proven by clear and convincing evidence at trial, the sufficiency of the plaintiff's prima facie showing on an anti-SLAPP motion is determined with the higher standard of proof in mind]; see *Looney v. Superior Court* (1993) 16 Cal.App.4th 521, 537–540 [20 Cal.Rptr.2d 182], and cases cited therein.)

■ In reviewing an anti-SLAPP motion, a court must consider the pleadings and the evidence submitted by the parties (§ 425.16, subd. (b)(2)); however, it cannot weigh the evidence, but instead must simply determine whether the respective party's evidence is sufficient to meet its burden of proof. (*Mattel, Inc. v. Luce, Forward, Hamilton & Scripps* (2002) 99 Cal.App.4th 1179, 1188 [121 Cal.Rptr.2d 794].) On appeal, we independently review the trial court's ruling on the motion to strike. (*Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 456 [125 Cal.Rptr.2d 534].)

■ During the pendency of this appeal, the California Supreme Court confirmed that a cause of action for malicious prosecution is subject to a special motion to strike under the anti-SLAPP statute. (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at pp. 734–741; see also *Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 114 Cal.Rptr.2d 825.) Although the Padres argue that the anti-SLAPP statute does not apply in this case because they waited to file suit until after "it was apparent that Henderson was out of legal challenges to the ballpark project," they cite no authority for their contention. Accordingly, we will focus on Henderson's challenges to the viability of the Padres' claims for malicious prosecution.

1. *Was Henderson Absolutely Privileged to File the Underlying Actions?*

Henderson asserts that the underlying actions were absolutely privileged in accordance with the California Supreme Court's decision in *Bozek*. There, the City of Long Beach brought a malicious prosecution action against Bozek after he unsuccessfully sued it and two of its police officers for false imprisonment and related torts arising out of alleged police misconduct. Bozek challenged the city's complaint, arguing that a governmental agency could not sue for malicious prosecution because of the potential chilling effect on the right of petition to obtain redress of grievances through the institution of judicial proceedings.

The California Supreme Court agreed with Bozek's argument. It recognized that the government, like all defendants subjected to meritless litigation, was injured to the extent it was required to pay attorney fees to defend the lawsuit and that the government's interest in recovering for this injury and in deterring unwarranted lawsuits was similar to that of a private person. However, the high court also recognized that "the act of filing suit against a governmental entity represents an exercise of the right of petition and thus invokes constitutional protection." (*Bozek, supra,* 31 Cal.3d at p. 534.) Finding that right would be impermissibly chilled if a governmental agency was permitted to file a retaliatory malicious prosecution action, the court held that a citizen's lawsuit against a governmental agency is "absolutely privileged" and cannot form the basis for civil liability to the agency in a malicious prosecution action. (*Id.* at pp. 531–534.) The *Bozek* court concluded "[i]n order to avoid the chilling effect upon the constitutional right of petition [that] would result if we were to allow municipalities to maintain actions for malicious prosecution, we conclude the best course is to defer to" other existing legislative remedies, including sanctions and attorney provisions contained in the Code of Civil Procedure. (*Bozek, supra,* 31 Cal.3d at p. 538.)

Henderson contends that, in accordance with *Bozek,* he was absolutely privileged to file the underlying actions and that "[t]he Padres can no more base their own claims of malicious prosecution on lawsuits against the City" than could the City itself. However, *Bozek* does not stand for the proposition that private parties sued in an action that was also brought against a governmental agency are constitutionally precluded from bringing a malicious prosecution action. In fact, the *Bozek* court recognized that the possibility of malicious prosecution actions by named parties other than the agency (in that case, the individual police officers) would have a deterrent effect on unwarranted lawsuits that also named a governmental agency. (*Bozek,* 31 Cal.3d at p. 538.)

The dissent attempts to distinguish the respective interests of the Padres in this case and those of the police officers named as defendants in *Bozek,* contending that the officers' dignity interests in recovering for damage to their reputations and for emotional distress from allegations of improper conduct by them gives rise to a "real" need for a tort remedy, while the Padres' interest in recovering additional costs of the ballpark project resulting from a malicious and frivolous action that was intended to make the cost of the project prohibitive would not. However, although the nature of the Padres' injuries is different from that of the officers', this distinction does not support the denial of relief in the latter instance but denying it in the former. It is a distinction without a difference.

Pursuant to Proposition C and the implementing agreements, the Padres were responsible for cost overruns relating to the project, a point that the City relied on in promoting the Proposition C ballot initiative to the public. Although the dissent contends that the Padres "could have" readily negotiated a different allocation of the risk relating to costs or losses arising from repeated legal challenges to the project, it strains credulity to believe that, if this were so easily accomplished, they would not have done so. In any event, the fact that the Padres did not, or were unable to, negotiate a different risk allocation does not render their loss any less "real" than those suffered by the police officers in *Bozek*.

Henderson also argues, however, that the policy considerations relied on by the court in *Bozek* are equally applicable where the underlying claim is a reverse validation proceeding, which by definition challenges governmental action. He argues that the statutory scheme already imposes heavy burdens on one who brings a reverse validation action, the exclusive means by which a citizen may challenge the validity of a governmental agency's contracts, obligations and indebtedness (§ 869; *Planning and Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 921 [100 Cal.Rptr.2d 173]), and that allowing the imposition of civil liability in malicious prosecution in addition to the existing burdens will create an unacceptable chill on citizens' rights to assert such a challenge.

The California Supreme Court has recognized that the validation statutes permit a governmental agency to effectively validate its contractual dealings—even those embodying important policy decisions affecting the public at large—by doing nothing, but "commensurately restrict[]" the public's opportunity to challenge those dealings by requiring that a reverse validation proceedings be brought within 60 days. (*City of Ontario v. Superior Court* (1970) 2 Cal.3d 335, 341–342 [85 Cal.Rptr. 149, 466 P.2d 693].) However, these difficulties are inherent in bringing a reverse validation action to challenge a governmental contractual decision and exist irrespective of whether a citizen who brings such an action is liable for malicious prosecution arising there from.

Although Henderson correctly points out that the possibility of malicious prosecution liability may make a citizen think twice before filing a reverse validation action, we do not believe that this is inappropriate. There is no policy reason to protect citizens who maliciously file frivolous reverse validation actions that are designed to thwart public projects through delay, litigation and increased project costs resulting therefrom by disallowing private parties who are individually injured by such conduct from suing for malicious prosecution. (See generally *Pace v. Hillcrest Motor Co.* (1980) 101 Cal.App.3d 476, 478 [161 Cal.Rptr. 662] ["[t]he tort of malicious prosecution

lied to compensate an individual who is maliciously hailed into court and forced to defend against a fabricated cause of action"].) The availability of the anti-SLAPP procedure provides adequate protection to persons who legitimately pursue reverse validation claims against nonmeritorious malicious prosecution claims arising from such an action. This balances the policies of discouraging frivolous litigation and protecting the rights of citizens to challenge governmental actions.

The dissent argues that federal principles underlying the *Noerr-Pennington* doctrine (which recognizes that one generally cannot be held liable for violations of federal antitrust laws arising out of efforts to petition the government for the redress of grievances) apply to this case, either directly or by analogy, and accuses us of "creating an unprecedented exception to the scope of the right to petition" in finding that Henderson was not absolutely privileged to file the underlying actions. However, as the dissent acknowledges, an exception to *Noerr-Pennington* immunity exists where one uses the governmental process (rather than its outcome) as a sham to cover anticompetitve conduct; a "classic example" of conduct to which immunity does not apply is where one brings "administrative and judicial actions . . . solely to impose expense and delay, with no expectation of success." (*Columbia v. Omni Outdoor Advertising, Inc.* (1991) 499 U.S. 365, 380 [113 L.Ed.2d 382, 111 S.Ct. 1344].) As with the sham exception to the *Noerr-Pennington* doctrine, malicious prosecution permits recovery only for petitioning activity that is shown to be both frivolous and malicious. We do not believe that our opinion creates an unprecedented exception to the scope of the right to petition, but instead appropriately balances the right of petition on one hand and the right of an injured party to recover under state tort law in accordance with applicable California Supreme Court precedents. (See *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1135, 1137 [270 Cal.Rptr. 1, 791 P.2d 587]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 322–323 [216 Cal.Rptr. 718, 703 P.2d 58].)

We also disagree with the dissent's contention that the similarity of the interests of the Padres and the City in the project "raise[s] the specter of a retaliatory policy designed to discourage legitimate exercise of the right of petition through the courts" that concerned the *Bozek* court. (*Bozek, supra,* 31 Cal.3d at p. 538, fn. 9.) The Padres have not attempted to, and cannot, recover for damages suffered by the City as a result of the litigation challenging the ballpark project. As the dissent recognizes, public-private collaborations are a modern reality, and in fact a necessity, of the development of major public works projects across the state. Disallowing private participants in such projects from recovering damages from actions that are frivolously and maliciously prosecuted will diminish the viability of such a mechanism for financing public projects. In light of the protections of the

anti-SLAPP procedure, we conclude that the application of the analysis of *Bozek* does not require such a result. (See post.)

■ For these reasons, we conclude that the bringing of a reverse validation action is not absolutely privileged and that a citizen who brings such an action is not automatically protected from civil liability for malicious prosecution to a private party who participates in the action. However, this is not to say that any party who chooses to appear in a reverse validation proceeding is entitled to sue for malicious prosecution if the action proves to be unsuccessful. Although a validation proceeding is an in rem action, the result of which is binding on the affected agency "and all other persons" (*Planning and Conservation League v. Department of Water Resources, supra*, 83 Cal.App.4th at p. 921), the validation proceeding will have a more substantial impact on persons who have a unique and substantial interest in the project. For example, it is undisputed here that the Padres had a direct and substantial financial interest in the ballpark project that was at the foundation of the governmental actions Henderson challenged in *Mailhot III* and *Currie*.

■ Because the Padres' interest in the ballpark project was distinct from that of the City and other members of the public, their rights were directly and uniquely placed at risk by the reverse validation proceedings and it is to be expected that they would participate in such proceedings. (See *Sierra Club, Inc. v. California Coastal Com.* (1979) 95 Cal.App.3d 495, 501 [157 Cal.Rptr. 190] [in an action seeking to invalidate a permit issued for a project, the developer was an indispensable party].) Under such circumstances, it is appropriate that parties who have a unique and substantial interest in a project and who participate in a reverse validation action to protect that interest are entitled to seek redress for damages suffered as a result of the action, if they are able to establish that the underlying action was frivolous and brought with malice.

Because Henderson's actions in filing the underlying actions were not absolutely privileged, we proceed to address the question of whether the Padres made a sufficient showing of the probability of success on the merits of their claims.

## 2. *Elements of a Malicious Prosecution Claim*

■ To establish a cause of action for the malicious prosecution of a civil proceeding, a plaintiff must plead and prove that the underlying action was (1) commenced by or at the direction of the defendant and pursued to a legal termination in the plaintiff's favor; (2) brought without probable cause; and (3) initiated with malice. (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 676 [34 Cal.Rptr.2d 386, 881 P.2d 1083].) We review the Padres' evidence in support

of their malicious prosecution claims to determine whether they have made a prima facie showing of each of the elements, below.

## A. *Favorable Termination*

■ A necessary element of a cause of action for malicious prosecution is that the underlying proceeding terminated favorably to the malicious prosecution plaintiff. (*Ray v. First Federal Bank* (1998) 61 Cal.App.4th 315, 318 [71 Cal.Rptr.2d 436] (*Ray*).) A termination is "favorable" if it was based on a determination of the merits of the action—that is, relating to the fault of the defendant, rather than on a technical or procedural ground. (*Lackner v. LaCroix* (1979) 25 Cal.3d 747, 750 [159 Cal.Rptr. 693, 602 P.2d 393].) Favorable termination is a necessary element because the very essence of a malicious prosecution action is the bringing of an unwarranted or unjustifiable action against the defendant. (*Jaffe v. Stone* (1941) 18 Cal.2d 146, 150 [114 P.2d 335]; *Cowles v. Carter* (1981) 115 Cal.App.3d 350, 354–355 [171 Cal.Rptr. 269].)

### i. *Mailhot III*

In this action, Henderson sought to invalidate the 1999 Annual Appropriation Ordinance on the ground that it violated certain provisions of CEQA and the City Charter. The trial court granted summary judgment motions in which the Padres joined, finding that the appropriation was not a "project" for purposes of CEQA, the claims were not properly the subject of a validation action and Henderson's arguments that the appropriation violated the terms of the MOU related to matters outside the scope of the complaint and thus were irrelevant and improper. (Although it is not clear from the record on appeal, it appears from the trial and appellate court opinions that Henderson did not raise a challenge relating to the City Charter independent of his MOU arguments.) On appeal, this court dismissed as moot Henderson's CEQA challenges "for the same reasons as we did in . . . *Mailhot II*" and affirmed the trial court's rejection of his argument that the appropriation violated the MOU because such claims were not properly pled in the complaint. We did not reach the issue of whether the matter was properly brought as a validation action.

This court's dismissal of Henderson's CEQA challenges was not based on the merits of those challenges but instead based on mootness. The decision thus did not constitute a favorable termination for purposes of a malicious prosecution action. (See *Robbins v. Blecher* (1997) 52 Cal.App.4th 886, 894 [60 Cal.Rptr.2d 815].) Similarly, the affirmance of the judgment based on Henderson's failure to include allegations that the adoption of the ordinance violated the MOU was not based on the merits, but on procedural grounds.

(See *Jaffe v. Stone, supra,* 18 Cal.2d at pp. 150–151; *Lackner v. LaCroix, supra,* 25 Cal.3d at pp. 751–752.) The question becomes whether this court's resolution of Henderson's appeals on procedural grounds precludes the Padres from relying on the trial court's substantive determination as a " favorable termination" in support of their malicious prosecution claim. We conclude that it does not.

■ Where an underlying action is finally resolved on appeal, the issue of whether the malicious prosecution plaintiff obtained a favorable termination may be determined by reference to the appellate court's decision rather than that of the trial court. For example, in *Ray, supra,* 61 Cal.App.4th at pages 318–319, the trial court granted summary judgment on statute of limitations grounds in the underlying action for legal malpractice, but on appeal, the appellate court affirmed the trial court's ruling based on a finding that the law firm had not violated any duty to its client and did not reach the issue of whether the action was untimely filed.

In the law firm's ensuing action against the former client for malicious prosecution, the Court of Appeal concluded that the underlying appellate decision established a favorable termination in favor of the firm. It held "the appellate decision affirming summary judgment in the malpractice case both marked and constituted favorable termination of that case. Not only was the decision 'favorable,' as just observed, it also accomplished the final termination of the case. The malpractice case was not terminated until conclusion of the [client's] appeal, and the affirmance of the judgment in favor of [the law firm] constituted a favorable termination on the merits." (*Ray, supra,* 61 Cal.App.4th at p. 318–319; accord *Friedman v. Stadum* (1985) 171 Cal.App.3d 775 [217 Cal.Rptr. 585] [finding no favorable termination where the underlying action was subject to a pending appeal].)

■ Although *Ray* recognizes that an appellate decision reflecting on the merits of a plaintiff's claims may establish a favorable termination for purposes of a malicious prosecution action, it does not establish that the appellate decision reached solely on procedural grounds trumps a trial court's determination of the merits and requires a finding that there is no favorable termination. In fact, it is well established that a favorable termination exists when the decision relied upon "reflects 'the opinion of someone, either the trial court or the prosecuting party, that the action lacked merit or if pursued would result in a decision in favor of the defendant.' " (*Eells v. Rosenblum* (1995) 36 Cal.App.4th 1848, 1855 [43 Cal.Rptr.2d 323].) A trial court's determination of the merits of the plaintiff's claims adverse to the plaintiff meets this standard and we conclude that it is sufficient to constitute a favorable termination unless it is later rejected by an appellate court.

 Here, although the bases for this court's holdings were procedural rather than substantive, the trial court made a substantive determination that the *Mailhot III* claims were without merit. Its determination was sufficient to constitute a "favorable termination" as needed to support a claim for malicious prosecution.

### ii. *Currie*

The Padres' malicious prosecution complaint challenges Henderson's attempts in *Currie* to invalidate the Bond Ordinance on the following grounds: (1) the ordinance violated the 1999 Annual Appropriation Ordinance, and the City Charter's balanced budget requirement; and (2) the Padres had not made certain disclosures required by City Charter section 225. The trial court granted summary judgment in favor of the City, rejecting Henderson's arguments on their merits.

 On appeal, this court affirmed the trial court's judgment on procedural and substantive grounds. We held in relevant part that the Bond Ordinance did not obligate the City to expend more than $225 million in the 1999–2000 fiscal year in violation of the 1999 Annual Appropriation Ordinance and City Charter section 225 did not require disclosures by the Padres. This court's opinion in *Currie* was based on a substantive determination that Henderson's claims were without merit. The decision constituted a final termination of the action in favor of the Padres and thus will support a malicious prosecution claim.

### iii. *Zoebisch*

 In *Zoebisch*, Henderson alleged that the proposed referendum petition was valid and properly submitted, thus requiring its placement on the ballot. The trial court granted summary judgment in favor of the City and the Padres, finding that the proposed Bond Ordinance initiative was invalid because it involved an administrative rather than a legislative act and in any event the supporting petitions were not timely submitted and failed to include certain materials. Although this court affirmed the trial court's judgment in *Zoebisch* on "entirely procedural grounds," as discussed above, the trial court's rejection of Henderson's claims on their merits constituted a favorable termination in favor of the Padres.

### B. *Lack of Probable Cause*

 To establish a claim for malicious prosecution, the plaintiff must demonstrate in part that the prior action was commenced by or at the direction of the defendant, without probable cause. (*Sheldon Appel Co. v.*

*Albert & Oliker*, *supra*, 47 Cal.3d 863 at p. 871 [254 Cal.Rptr. 336, 765 P.2d 498].) One has probable cause to bring a civil action if his claim is legally tenable, as determined on an objective basis. (*Roberts v. Sentry Life Insurance* (1999) 76 Cal.App.4th 375, 382 [90 Cal.Rptr.2d 408].) The issue of whether probable cause exists presents a question of law for the court and requires a determination of whether any reasonable attorney would have considered the action legally tenable in light of the facts known to the underlying plaintiff (or, in this case, the lawyer) at the time the suit was filed. (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 822, fn. 6 [123 Cal.Rptr.2d 19, 50 P.3d 733] ; *Swat-Fame, Inc. v. Goldstein* (2002) 101 Cal.App.4th 613, 624 [124 Cal.Rptr.2d 556].)

██ If any reasonable attorney would have considered the action legally tenable, probable cause is established. (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 881 [254 Cal.Rptr. 336, 765 P.2d 498].) This "lenient standard" for bringing a civil action reflects "the important public policy of avoiding the chilling of novel or debatable legal claims" and allows attorneys and litigants " 'to present issues that are arguably correct, even if it is extremely unlikely that they will win . . . .' [Citation.]" (*Wilson v. Parker, Covert & Chidester, supra*, 28 Cal.4th at p. 817.) Only those actions that " 'any reasonable attorney would agree [are] totally and completely without merit' " may form the basis for a malicious prosecution suit. (*Ibid.*)

The Padres assert that the trial court's rulings granting their motions for summary judgment in each of the three underlying actions constitutes evidence that Henderson's claims were not legally tenable. However, although the trial court's rulings are not necessarily irrelevant for this purpose, the Padres do not explain how the rulings, standing alone, would support the conclusion that Henderson's claims lacked probable cause at the time the actions were filed. "Favorable termination of the suit often establishes lack of merit, yet the plaintiff in a malicious prosecution action must separately show lack of probable cause. Reasonable lawyers can differ, some seeing as meritless suits which others believe have merit, and some seeing as totally and completely without merit suits which others see as only marginally meritless. Suits which all reasonable lawyers agree totally lack merit . . . are the least meritorious of all meritless suits. Only this subgroup of meritless suits present[s] no probable cause." (*Jarrow Formulas, Inc. v. LaMarche, supra*, 31 Cal.4th at p. 743, fn. 13, quoting *Roberts v. Sentry Life Insurance, supra*, 76 Cal.App.4th at p. 382.)

Apparently recognizing this, the Padres also cite to the history of the ballpark litigation in which Henderson was involved and argue that the absence of probable cause is established because in *Mailhot III, Currie* and *Zoebisch*, Henderson repeated claims that had been decided against him in

other actions. Henderson responds that each of the actions challenged a separate and distinct act by the City and thus the resolution of the other actions did not reflect on the tenability of the actions on which the Padres base their malicious prosecution claims. We review each of the cases in turn below.

i. *Mailhot III*

In *Mailhot I, II* and *III*, Henderson sought to invalidate the ordinance authorizing the submission of Proposition C for voter approval, the $225 Million Appropriation Ordinance and the 1999 Annual Appropriation Ordinance, respectively, in part on the ground that each such action constituted a final approval of the ballpark project, triggering CEQA's requirement that an EIR be prepared prior to such action. In the only decision rendered by this court prior to the filing of *Mailot III*, this court's opinion in *Mailot I* concluded in relevant part that the submission of Proposition C for voter approval was not a project for purposes of CEQA and that Proposition C did not violate the single subject requirement of the City Charter or require two-thirds voter approval.

In support of their malicious prosecution claim based on *Mailhot III*, the Padres cite to the trial court's ruling in *Mailhot II* suggesting (but not holding) that Henderson's CEQA challenge in that case may have been rendered moot by the decision in *CARE* requiring the City to cease further work on the project pending the preparation of an EIR. However, although the trial court's statement was an indication that it was concerned that the CEQA challenge in *Mailhot II* was moot (and that subsequent CEQA challenges to various actions by the City might also be considered to have the same infirmity), the statement did not constitute a determination of mootness in *Mailhot II*, nor did it constitute prima facie evidence that Henderson's CEQA challenge in *Mailhot III* was completely and totally without merit.

The Padres also cite to this court's determination that the CEQA challenge in *Mailhot II* was moot in light of the City's intervening certification of an EIR for the project. However, our opinion in *Mailhot II* issued well over a year after Henderson filed *Mailhot III* and thus does not establish that Henderson lacked probable cause, at the outset, to assert a CEQA challenge in that case.

The Padres further contend that even if Henderson's CEQA claim in *Mailhot III* was not established as meritless, this court's opinion in *Mailhot I* establishes that all of the *Mailhot III* claims lacked probable cause because "no reasonable attorney would file an analytically identical claim knowing that the very appellate court that would review the judgment in the case had

already analyzed it in a way that assured defeat." However, the Padres neither cite any persuasive authority to support this argument, nor do they explain how the challenges to the validity of Proposition C under the California Constitution, CEQA and the City Charter raised in *Mailhot I* were "analytically identical" to Henderson's challenges to the 1999 Annual Appropriation Ordinance under CEQA and the City Charter in *Mailhot III*.

 The Padres have not established a prima facie showing that the claims in *Mailhot III* were completely and totally without merit and thus that Henderson lacked probable cause in filing those claims.

### ii. *Currie*

The Padres' third malicious prosecution cause of action is based on Henderson's claims in *Currie* that the Bond Ordinance violated the 1999/2000 annual budget and City Charter section 225. (To the extent the Padres argue that other causes of action asserted in *Currie* were legally untenable, their argument goes beyond the scope of the allegations of their malicious prosecution complaint and thus is not properly considered on appeal as a basis for upholding the trial court's denial of Henderson's anti-SLAPP motion.) The Padres appear to contend that the trial court's granting of summary judgment and this court's decision in *Dunkl* establish that the claims in *Currie* lacked probable cause. However, they also admit that these rulings came *after* Henderson filed *Currie* and thus the rulings themselves do not establish a lack of probable cause. (*Wilson v. Parker, Covert & Chidester, supra,* 28 Cal.4th at p. 822, fn. 6 [probable cause is determined based on whether any reasonable attorney would have considered the action legally tenable in light of the facts known to the lawyer at the time the suit was filed].)

The Padres also argue, however, that the underlying facts establish the *Currie* claims' lack of merit. As to Henderson's causes of action asserting that the Bond Ordinance called for the issuance of bonds in violation of the 1999 Annual Appropriation Ordinance, the Padres argue that the ordinance in fact only authorized the Financing Authority, a separate entity, to raise the funds that would be used for the City's investment in the ballpark project and thus did not violate the 1999 Annual Appropriation ordinance or the City Charter. The law at the time Henderson filed *Currie* was clear in this regard (see *Rider v. City of San Diego* (1998) 18 Cal.4th 1035, 1042–1045 [77 Cal.Rptr.2d 189, 959 P.2d 347]), as expressly recognized by both the trial court and this court's unpublished opinion in *Currie*. The Padres' argument is well taken.

The evidence in the record is likewise sufficient to support a prima facie showing that there was no probable cause to assert Henderson's remaining

claims (that is, those based on allegations that the Bond Ordinance was invalid because the Padres had not made certain disclosures required under City Charter section 225). City Charter section 225 provides in relevant part: "No right, title or interest in the City's real or personal property, nor any right, title or interest arising out of a contract, or lease, may be granted or bargained pursuant to the City's general municipal powers or otherwise, . . . , unless the person applying or bargaining therefor makes a full and complete disclosure of the name and identity of any and all persons directly or indirectly involved in the application and identity of any and all persons directly or indirectly, involved in the application or proposed transaction and the precise nature of all interests of all persons therein." "Failure to fully disclose all of the information enumerated above shall be grounds for denial of any application or proposed transaction or transfer and may result in forfeiture of any and all rights and privileges that have been granted heretofore."

The Padres were not party to the agreements authorized pursuant to the Bond Ordinance and thus there was no basis on which the Bond Ordinance would trigger the application of City Charter section 225. (See *Currie v. City of San Diego, supra,* (Mar. 28, 2001, D035891) [nonpub opn.].) Further, although the charter provision authorizes the City to unwind a transaction for which required disclosures are not made to the City, it does not purport to create a private right of action by which citizens can force the City to set aside the transaction. These factors are sufficient to support a prima facie showing that Henderson's challenges to the Bond Ordinance based on the City Charter section 225 were completely without merit.

The dissent opines that our finding regarding the sufficiency of the Padres' showing of lack of probable cause in *Currie* will have "staggering" consequences. We cannot agree. There is a sufficient basis in the record to support the denial of Henderson's special motion to strike and to permit further proceedings on the validity of the Padres' malicious prosecution claim arising out of the *Currie* litigation.

iii. *Zoebisch*

The Padres' fourth malicious prosecution cause of action is based on Henderson's claims in *Zoebisch* that the City was required to accept the attempted Bond Ordinance initiative petition, that the petition was a proper subject for referendum and that the voter signatures on the petition were valid. The Padres rely on the trial court's ruling granting summary judgment in favor of the City and the Padres in *Dunkl,* in which the court determined that Henderson's attempt to place the Proposition C initiative on the ballot was improper because it sought to accomplish administrative rather than

legislative action and thus was beyond the power of the voters to adopt. As noted above, however, the trial court's summary judgment ruling, standing alone, does not suffice as a prima facie showing that Henderson's attempt in *Zoebisch* to qualify the Bond Ordinance initiative lacked probable cause. (See *Jarrow Formulas, Inc. v. LaMarche, supra*, 31 Cal.4th at pp. 742–743.)

The Padres also argue, however, that the claims asserted in *Zoebisch* were not legally tenable in light of Henderson's failure to timely submit the referendary petition to the city clerk. In light of the clear language of the municipal code provision requiring submission of referenda materials to the clerk within 30 days after the governmental action and the purpose of the requirement, i.e., to allow the clerk to make a threshold determination of whether the materials complied with the applicable procedural requirements for placement on the ballot, this argument has facial appeal. However, in *Zoebisch*, Henderson also asserted that the City should be equitably estopped by its conduct from asserting that his petition was untimely. Although this court ultimately rejected Henderson's equitable estoppel argument, we recognized that the City had "regrettably participated" in posturing in connection with Henderson's attempt to file the petition and, like Henderson, had "pursu[ed its] own agenda[] in a vigorous and headstrong way." Given the assertion of such an argument and the apparent existence of some underlying facts that would support such an argument, we cannot conclude that the failure to timely submit the referendary petition rendered Henderson's claims in *Zoebisch* completely and totally without merit.

Finally, the Padres cite to a passing statement made by Henderson during oral argument in the trial court in *Dunkl* in which he suggested that the City's authorization of lease revenue bonds to finance its contribution to the ballpark project would be "just implementation" of the legislative policy established by Proposition C and thus administrative rather than legislative in nature. However, although Henderson's statement is relevant on the issue, standing alone it does not establish that no reasonable attorney would have considered legally tenable his contention in *Zoebisch* that the Bond Ordinance initiative was legislative rather than administrative. At best, Henderson's statement reflected his subjective beliefs about the nature of the proposed Bond Ordinance initiative at issue in *Zoebisch*. Because the focus of probable cause analysis is objective rather than subjective, this evidence does not make a showing that the claims in *Zoebisch* were legally untenable.

The Padres have not submitted sufficient evidence to make a prima facie showing that the claims asserted in *Zoebisch* were completely and totally without merit.

## C. Malice

■ Because the Padres have not met their burden of making a prima facie showing that *Mailhot III* and *Zoebisch* lacked probable cause, we limit our analysis of the malice element to the Padres' malicious prosecution claim arising out of *Currie*. For purposes of a malicious prosecution tort, malice relates to the subjective intent or purpose with which the defendant acted in initiating the prior action. (*Sheldon Appel Co. v. Albert & Oliker, supra,* 47 Cal.3d at p. 874.) To establish this element, the Padres are required to show that Henderson had an improper motive in bringing the prior actions. (*Swat-Fame, Inc. v. Goldstein, supra,* 101 Cal.App.4th at p. 633.) Henderson argues that, to succeed in this, the Padres must make a prima facie showing of facts that would permit a finding of malice based on a clear and convincing evidence standard. However, Henderson is mistaken in this regard. (*Jacques Interiors v. Petrak* (1987) 188 Cal.App.3d 1363, 1371 [234 Cal.Rptr. 44] [applying a preponderance standard to the malice element of a malicious prosecution claim].) Thus, we must determine whether the Padres have presented sufficient evidence to establish a prima facie showing of malice by a preponderance of the evidence.

■ Malice is usually proved by circumstantial evidence. (*See Sheldon Appel Co. v. Albert & Oliker, supra,* 47 Cal.3d at p. 875.) Although a lack of probable cause, standing alone, does not support an inference of malice, malice may still be inferred when a party knowingly brings an action without probable cause. (*Swat-Fame, Inc. v. Goldstein, supra,* 101 Cal.App.4th at p. 634.) ■ Here, the Padres have submitted evidence from which a reasonable person could infer that Henderson repeatedly filed actions challenging the City's actions relating to the ballpark project in order to interfere with and/or derail the project. This evidence is sufficient to establish a prima facie case of improper motive as an element of the Padres' malicious prosecution claims.

## 3. *Conclusion*

We conclude that although the Padres' action against Henderson is not barred under the analalysis of *Bozek,* they have not met their statutory burden of establishing a probability of success on the merits of their malicious prosecution claims based on *Mailhot III* and *Zoebisch.* We also conclude, however, that the Padres have produced evidence supporting each of the three elements of the malicious prosecution tort relating to the *Currie* action and have satisfied their burden to make a prima facie showing in support of their malicious prosecution claim arising out of that lawsuit. In reaching this conclusion, we do not express any view on whether there will be any merit to the Padres' claim at trial. We have merely determined that, based on the

record before us, the Padres have met their burden to show a probability of success within the meaning of section 425.16.

## DISPOSITION

The order of the superior court denying Henderson's special motion to strike is reversed as to the Padres' second and fourth causes of action. Otherwise, the order is affirmed. Each party is to bear its own costs of appeal.

Nares, J., concurred.

**BENKE, Acting P. J.** —I respectfully dissent.

Public officials in this state are subject to a myriad of inconvenient limitations on their power to tax and spend. Today those limitations are weaker than they were yesterday. With no pertinent authority supporting its position, with controlling authority clearly contrary to its holding, the majority permits citizens to be sanctioned and held liable for malicious prosecution where they unsuccessfully attempt to enforce one or more of those limitations. Following today's holding only the bravest and wealthiest will dare challenge the way a public agency has interpreted its powers. The majority compounds this error by allowing a malicious prosecution action to be brought by a private party with substantial interests in a citizen complaint against a government entity, thus creating an unprecedented categorical exception to the doctrine of petition immunity.

## I

### PROBABLE CAUSE

However Bruce Henderson may be perceived by his adversaries, whatever his subjective intentions might be, he had probable cause to bring *Currie v. City of San Diego* (Super.Ct. San Diego County, 2000, No. GIC743443 (*Currie*). He was therefore not subject to sanction or liability in tort.

### A

As the majority acknowledges, in the context of liability for malicious prosecution, litigants are given the benefit of a very generous probable cause standard. (Maj. opn., *ante*, at pp. 516–518.) The standard, described by the court in *Roberts v. Sentry Life Insurance* (1999) 76 Cal.App.4th 375, 382 [90 Cal.Rptr.2d 408], bears repeating: "Reasonable lawyers can differ, some seeing as meritless suits which others believe have merit, and some seeing as totally and completely without merit suits which others see as only marginally meritless. Suits which *all* [orig. italics] reasonable lawyers agree totally lack merit—that is, those which lack probable cause—*are the least meritorious of*

*all meritless suits. Only this subgroup of meritless suits present no probable cause."* (Italics added; quoted with approval *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 743, fn. 13 [3 Cal.Rptr.3d 636, 74 P.3d 737].)

As the majority recognizes, the liberal standard reflects "the important public policy of avoiding the chilling of novel or debatable legal claims." (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 885 [254 Cal.Rptr. 336, 765 P.2d 498] (*Sheldon Appel*); see also *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179].) Indeed, "in evaluating whether or not there was probable cause for malicious prosecution purposes, a court must properly take into account the evolutionary potential of legal principles." (*Sheldon Appel, supra,* 47 Cal.3d at p. 886.) Thus, there is probable cause for a claim if it is "arguably 'warranted by existing law' or at the very least . . . based on an *objectively 'good faith argument for the extension, modification, or reversal of existing law.'* " (*Real Estate Investors v. Columbia Pictures* (1993) 508 U.S. 49, 65 [113 S.Ct. 1920, 123 L.Ed.2d 611], italics added.)[1]

My colleagues also acknowledge probable cause must be determined by the court as a question of law and that it must be decided on an objective basis. (Maj. opn., *ante,* at p. 517; *Sheldon Appel, supra,* 47 Cal.3d at pp. 875, 878.)

B

The majority has not only set out the correct substantive and procedural principles, in discussing *Mailhot III* it correctly applies those principles. (Maj. opn., *ante,* at p. 518.) Although I might not go so far as to limit malicious prosecution actions to claims which are "analytically identical" to previously litigated claims, I agree with the majority that such a showing would be sufficient to demonstrate the absence of probable cause. (Maj. opn., *ante,* at p. 518.) I also agree with the majority that such a showing requires a fairly convincing explanation of how a prior claim foreclosed relitigation of that claim in a later proceeding. (Maj. opn., *ante,* at p. 519.)

Having correctly described the principles governing malicious prosecution actions and applied them to *Mailhot III,* the majority then, inexplicably,

---

[1] In *Umansky v. Urquhart* (1978) 84 Cal.App.3d 368, 372 [148 Cal.Rptr. 547], this court itself rejected the contention that a plaintiff's attempt to overturn existing precedent would support a related abuse of process claim: "The law, however, is not immutable. It remains in flux to allow for constructive change through the efforts of diligent and conscientious lawyers. It is through legal imagination and ingenuity in pleading that evolution of the law occurs. Whether we examine the law of torts and the development of strict liability for product defect [citation] or family law and the division of retirement benefits as community property [citation], we note the effect of the dynamics of the legal process. Statutes which withstand constitutional challenge in one year may be declared unconstitutional in later years." (See also *Tullai v. Homan* (1987) 195 Cal.App.3d 1184, 1188 [241 Cal.Rptr. 255].)

entirely abandons those principles when considering the *Currie* claim. Without any attempt to find analytical identity, the majority concludes that Henderson had no probable cause to prosecute the *Currie* claims.

The majority concludes that in light of *Rider v. City of San Diego* (1998) 18 Cal.4th 1035, 1042–1045 [77 Cal.Rptr.2d 189, 959 P.2d 347], Henderson should have known that the bond ordinance did not violate San Diego City Charter provisions governing annual appropriations. (Maj. opn., *ante*, at p. 519.) In addition, the majority finds that Henderson should have realized the Padres was not subject to disclosure requirements imposed on parties who obtain property or contract rights from the city. (Maj. opn., *ante*, at p. 520.) In reaching these conclusions, the majority opinion affords the *Currie* claims none of the freedom required by *Sheldon Appel* or provided by the majority itself in considering the *Mailhot III* claim. Moreover, notwithstanding its articulation of the required procedure, the majority's *Currie* discussion strongly suggests probable cause is a subjective matter which will ultimately be determined by a jury.

### 1. *Rider v. City of San Diego*

For the majority, the holding in *Rider v. City of San Diego* should have made it "clear" to Henderson that the city charter claims he advanced in *Currie* lacked merit. (Maj. opn., *ante*, at p. 519.) However, as Henderson points out in his petition for rehearing, the majority fails to fully and accurately discuss the claims he advanced in *Currie*. The majority opinion also fails to consider the nature of the holding in *Rider v. City San Diego*. Had the majority discussed Henderson's claims and the holding in *Rider v. City of San Diego* more thoroughly, it could not have found the clarity its summary approach yields.

*Rider v. City of San Diego* dealt with the debt limitation provisions of article XVI, section 18 of the California Constitution. Under article XVI, section 18, a local agency may not incur a debt for more than one year without obtaining the consent of two-thirds of the municipality's voters. In interpreting this provision the court in *Rider v. City of San Diego* found that a separate financing entity created by a municipality is not subject to section 18's *debt limitation* provisions. (*Rider v. City of San Diego, supra,* 18 Cal.4th at pp. 1042–1044.) In doing so the court conceded that in an earlier case, *Rider v. County of San Diego* (1991) 1 Cal.4th 1, 11–12 [2 Cal.Rptr.2d 490, 820 P.2d 1000], it had been unwilling to respect the separate identity of similar entities for purposes of interpreting the distinct *tax limitation* provisions of Proposition 13: "[In *Rider v. County of San Diego*] [w]e stated that, when a city or county creates and 'essentially control[s]' a local taxing agency, a court can infer that the agency is a 'special district' 'created to . . . circumvent Proposition 13.' [Citation.] . . . In *Rider v. County of San Diego,* we expressly

rejected the conclusion that the essential control standard established the identity of two separate governmental entities: 'Rather than attempting to demonstrate that the subject agency and county are *identical* entities, application of the "essential control" test simply affords ground for reasonably inferring an intent to circumvent Proposition 13.' [Citation.]" (*Rider v. City of San Diego, supra,* 18 Cal.4th at p. 1044.)

In explaining its willingness to respect the separate identity of a financing agency in applying California Constitution article XVI, section 18, when it was unwilling to do so in applying Proposition 13, the court in *Rider v. City of San Diego* noted that the terms of the two constitutional provisions were different: section 18 only applies to municipalities, while Proposition 13 also covers special districts. (*Rider v. City of San Diego, supra,* 18 Cal.4th at p. 1044.) The court also noted that in the case it was considering, the financing agency in fact had a separate existence which would insulate the city from liability, while in the earlier Proposition 13 case, the entity's "only purpose was to impose the taxes and pass the tax revenues to the county. From both the voters' and the county's perspectives, the arrangement was no different than if the county had imposed the taxes directly." (*Ibid.*)

In short, the only principle *Rider v. City of San Diego* makes clear is that there is *no clarity* with respect to how separate financing agencies will be treated under the myriad of tax and spending limitations which the People have imposed on both state and local governments. Rather, the court's opinion stands for the proposition that *some* financing agencies will not be treated as subject to *some* fiscal limitations and *other* financing agencies will be subject to *other* fiscal limitations. (*Rider v. City of San Diego, supra,* 18 Cal.4th at p. 1044.)

This brings us to the claims asserted by Henderson in the *Currie* litigation and *Rider v. City of San Diego's* potential impact on them. Henderson's principal contention in *Currie* was that Proposition C did not permit the city to incur more than $225 million in debt in order to meet its obligations under the memorandum of understanding. Because the bond ordinance permitted $299 million in indebtedness, Henderson argued that it violated the limitation approved by the voters when they adopted Proposition C. In rejecting this argument the trial court found, and we agreed, that as written Proposition C permitted the city to incur a gross debt in excess of $225 million so long as the net amount the city contributed to the ballpark project by the city was limited to $225 million. In doing so neither the trial court nor this court relied upon *Rider v. City of San Diego* and, as the majority points out, Henderson's principal claims are not the basis of his potential liability for malicious prosecution.

However, as an alternative to his Proposition C claim, Henderson asserted that in adopting the bond ordinance the city had also violated section 84 of the city charter, which requires that all annual expenditures by the city be approved by way of a budget appropriation. Henderson argued that because the bond ordinance authorized the financing agency to incur $299 million in debt, the city had exceeded its own July 1999 appropriation of $225 million for ballpark funding. Both the trial court and this court found that under *Rider v. City of San Diego* the financing agency was not subject to the appropriation limitation of section 84.

The opinion in *Currie* is now final and I have no quarrel with the conclusions we reached there. However, two issues bear noting. First, although the city argued in *Currie* that the debt incurred by the financing agency was not subject to the appropriation requirements of section 84 of the charter, the city did make an appropriation of $225 million in its budget, which the city's budget stated would come from debt issued by the financing agency. While the city, when challenged, argued that no appropriation was needed for the financing agency's activities, it nonetheless made an appropriation for those activities. Thus the city's own conduct would have contributed, in part, to a reasonable attorney's belief that the financing agency was subject to section 84 of the city charter.

Secondly, the *debt* limitation discussed in *Rider v. City of San Diego* is different in important respects from the *appropriation* limitation in section 84 of the city charter. As we have seen, *Rider v. City of San Diego* permitted local agencies to avoid the voter approval requirements of California Constitution article, XVI, section 18, because those requirements are not expressly imposed on separate financing agencies and because the separate financing agency it was considering in fact insulated the local agency from debt. Here, City Charter section 84 governs "any obligation for the expenditure of money." It is quite reasonable to conclude, as we did without a great deal of discussion in *Currie,* that the language of this provision, like the language considered in *Rider v. City of San Diego,* does not govern the obligation of any entity other than the city itself. On the other hand, in light of the city's own conduct in making an appropriation with respect to the funds to be obtained by the financing agency and the fiscal transparency which is an obvious and important goal of section 84, a lawyer might reasonably conclude that *Rider v. City of San Diego* does not apply to the appropriation requirements of the city charter. A reasonable attorney might conclude that given the fact the city was not likely to permit one of its agencies to default on the bonds, those bonds had to be accounted for by way of an appropriation in its annual budget. Importantly, there is nothing in *Rider v. City of San Diego* itself which forecloses such a novel argument.

Because of the obvious differences between the constitutional provisions considered by the court in *Rider v. City of San Diego* and section 84 of the city charter, Henderson cannot be fairly accused of doing more than making an "objectively 'good faith argument for the extension, modification, or reversal of existing law.' " (*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., supra,* 508 U.S. at p. 65.) Until today, he could do so free of any liability for malicious prosecution or sanctions. (See *Sheldon Appel, supra,* 47 Cal.3d at p. 885; *In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 650.)

The absence of any meaningful discussion in the majority opinion of the nature of Henderson's argument or of the facts and reasoning in *Rider v. City of San Diego,* upon which the majority relies in finding Henderson potentially liable in tort (maj. opn., *ante,* at p. 519), strongly suggests the majority believes a fuller discussion is unnecessary at this point because it will be for the trier of fact to make the final probable cause determination. The perception my colleagues create that the trier of fact has some role in determining probable cause on a subjective basis is confirmed by its reference to a "prima facie showing" of probable cause. (Maj. opn., *ante,* at p. 519.) Under *Sheldon Appel* probable cause is not a matter of presenting a prima facie case to a judge and then letting a jury make the final determination as to whether a claim was justified. As the majority itself recognizes, under *Sheldon Appel* the court is the final arbiter of probable cause and the issue is to be decided without regard to a defendant's subjective beliefs.

### 2. *Charter Section 225*

With respect to Henderson's contention the Padres was subject to city charter section 225, Henderson's position is simpler and stronger. Section 225 mandates disclosure of the interests of all persons "applying or *bargaining therefor*" (italics added) property or contract rights from the city. There was not, until our opinion in *Currie* was filed, any definitive interpretation of the city charter section 225. Arguably the Padres, given its direct interest in the transaction, could be considered a person who "bargained for" the bond ordinance. Until we rejected such a broad interpretation in *Currie,* it can hardly be said that no reasonable attorney would have argued that the Padres was subject to city charter section 225. Again, Henderson acted well within the necessarily broad confines of probable cause.

In finding potential malicious prosecution liability in the absence of any governing authority with respect to the ambiguous terms of city charter section 225, the majority has, as a practical matter, equated Henderson's lack of success with the absence of probable cause. This of course is precisely what *Sheldon Appel* forbids.

## II

## PETITION IMMUNITY

In addition to my disagreement with the majority's probable cause holding, I also disagree with the broad categorical exception to petition immunity my colleagues have created for private parties who have a substantial interest in underlying litigation in which a government policy was challenged. (Maj. opn., *ante*, at pp. 511–512.)

### A

The history of our right-to-petition jurisprudence consists of plaintiffs who were in precisely the same position as the Padres. In *Eastern Rail Pres. Conf. v. Noerr Motor Frgt., Inc.* (1961) 365 U.S. 127 [81 S.Ct. 523, 5 L.Ed.2d 464] (*Noerr*), *United Mine Workers v. Pennington* (1965) 381 U.S. 657 [85 S.Ct. 1585, 14 L.Ed.2d 626], *California Motor Transport Co. v. Trucking Unlimited* (1972) 404 U.S. 508 [92 S.Ct. 609, 30 L.Ed.2d 642] (*California Transport*), *Blank v. Kirwan* (1985) 39 Cal.3d 311 [216 Cal.Rptr. 718, 703 P.2d 58] and *Real Estate Investors v. Columbia Pictures, supra,* 508 U.S. 49 private plaintiffs, like the Padres, argued that a defendant had petitioned the government in one fashion or another and in doing so caused them substantial harm. In each of those cases it was undisputed the plaintiffs were substantially interested in the underlying legislative, executive or judicial proceeding. Nonetheless, in all of those cases the courts had no difficulty finding that notwithstanding the private status of the plaintiffs, the defendants were protected by the right to petition. Given this history, the Padres' status as a private party should not, by itself, deprive Henderson of his right-to-petition immunity.

Contrary to the suggestion in the majority opinion, nothing in *City of Long Beach v. Bozek* (*Bozek*) (1982) 31 Cal.3d 527, 533–535 [183 Cal.Rptr. 86, 645 P.2d 137], supports a categorical exception to right-to-petition immunity. In *Bozek* the court extended right-to-petition immunity to citizens who have unsuccessfully sued governmental agencies for damages in tort. In *Bozek* the plaintiff sued the city and two of its police officers for false imprisonment, false arrest, negligent hiring, assault and battery. The suit was unsuccessful and the city brought a malicious prosecution action against the plaintiff. In finding that a malicious prosecution action brought by a governmental agency would unduly interfere with the right to petition, the court stated: "It is essential to protect the ability of those who perceive themselves to be aggrieved by the activities of governmental authorities to seek redress through all the channels of government. A tort action against a municipality is but one of the available means of seeking redress. If cities are permitted to

bring malicious prosecution actions against those who have unsuccessfully sued them, the institution of legitimate as well as baseless legal claims will be discouraged. The elements of malicious prosecution, though difficult to prove, are easily alleged. [Citations.] Allowing cities to sue for malicious prosecution against unsuccessful former plaintiffs would provide the municipalities with a sharp tool for retaliation against those who pursue legal actions against them. Indeed, it is not unlikely that even good faith claimants would forego suit in order to avoid the possibility of having to defend against a subsequent malicious prosecution action should their action against the city prove unsuccessful." (*Id.* at pp. 535–536.)

In making citizens immune from malicious prosecution actions brought by government agencies, the court also relied on the fact that the agencies could recover their litigation costs and deter frivolous lawsuits by seeking and obtaining sanctions under Code of Civil Procedure section 128.5. (*Bozek, supra,* 31 Cal.3d at p. 535.)

The court in *Bozek* however was careful to limit its holding to claims made by governmental agencies themselves. The individual police officer's claims were not before the court and with respect to those claims the court stated "such suits are different from suits by governmental entities themselves in at least two important ways: First, police officers have an interest in recovering damages for harm to their reputations and for emotional distress caused by lawsuits alleging improper conduct on their part. Second, suits by police officers do not necessarily *raise the specter of a retaliatory policy designed to discourage legitimate exercise of the right to petition through the courts.* Although this case does not present the issue, it is conceivable that suits brought by individual police officers might require that a different balance be struck between the right of petition and the tort policies underlying the malicious prosecution cause of action." (*Bozek, supra,* 31 Cal.3d 538, fn. 9, italics added.)

As indicated by the court in *Bozek,* in determining whether a private party plaintiff is subject to the right to petition, we should look at the nature of the interest being asserted by the plaintiff and consider whether litigation by the plaintiff would raise the specter of retaliation designed to discourage exercise of the right to petition through the courts. In the case of the individual police officers who had been sued for false arrest, the court noted their unique interest in their reputations and the distress they suffered. Given the dignity interests implicated by the claims made against them, the need for a tort remedy could be very real. Moreover, the individual actions which were the genesis of the underlying litigation against the officers did not necessarily implicate any policymaking by the city such that litigation by the officers would suggest retaliation by the city itself. Indeed, the plaintiffs did not need

to bring individual claims against the officers to proceed against the city, nor did they need to bring claims against the city in order to pursue individual claims against the officers.

Here, we have a quite different situation. The Padres does not fall within the category of individuals *Bozek* opines might maintain a malicious prosecution action. Although the Padres may have suffered damage apart from the city and in addition to the litigation costs it incurred, those damages were in the nature of consequential contract damages, the risk of which was known by both the city and the Padres at the time they reached the ballpark agreements. Thus unlike the injuries the police officers suffered, the Padres could have negotiated with the city with respect to allocation of the risk of litigation challenging the agreements and protected itself from loss. Thus the need for a tort remedy here is not as apparent as in the case of the police officers. Moreover, because Henderson was challenging, as unlawful, the city's decision to enter into the ballpark agreements with the Padres, there was no means by which Henderson could challenge the city's policy decision without implicating the Padres's interests. Given the fact that the city's policy decision and the Padres's interests were inextricably bound together, any tort liability imposed for that challenge does in fact raise the specter of retaliation against Henderson for the exercise of First Amendment rights. In this regard the impact of our decision on the ability of citizens to challenge the activities of their government cannot be overstated. The reality of modern municipal government is that governing bodies make many of their most important policy decisions by way of agreements with or affecting private parties. The decision to finance a major public works project, which was the subject of Henderson's challenge, was in no sense unusual for the city of San Diego or any other municipality. Its impact on the community, for good or ill, will be felt for many years to come. We should not, by way of permitting an affected party to bring a malicious prosecution action, discourage citizens from challenging such important policy decisions.

B

Instead of creating an unprecedented exception to the scope of the right of petition, we would be far better served by confining ourselves to the narrower "sham" exception to petition immunity which has already been articulated in case law. (See *Noerr, supra,* 365 U.S. at p. 144; *California Transport, supra,* 404 U.S. at p. 513; *City of Columbia v. Omni Outdoor Advertising* (1991) 499 U.S. 365, 380 [111 S.Ct. 1344, 113 L.Ed.2d 382] ; *Blank v. Kirwan, supra,* 39 Cal.3d at p. 322.)

The sham exception is governed by a two-part test. "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that

the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor,' [citation] through the 'use [of] the governmental processas opposed to the outcome of that processas opposed to the outcome of that processan anticompetitive weapon,' [citation]. This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability." (*Real Estate Investors v. Columbia Pictures, supra,* 508 U.S. at pp. 60–61, fn. omitted.)

Although in *Blank v. Kirwan* the court discussed the sham exception, it did not apply it. In *Hi-Top Steel Corp. v. Lehrer* (1994) 24 Cal.App.4th 570 [29 Cal.Rptr.2d 646], the court did apply the exception. In explaining the sham exception, the court stated " '[t]he sham exception . . . reflects a judicial recognition that not all activity that appears as an effort to influence government is actually an exercise of the first amendment right to petition. At times this activity, disguised as petitioning, is simply an effort to interfere directly with a competitor. In that case, the "sham" petitioning activity is not entitled to first amendment protection, *because it is not an exercise of first amendment rights.*' [Citation.] If defendants are simply attempting to interfere with a competitor, not genuinely attempting to petition the government for redress of grievances, then imposing liability for their actions does not interfere with their state constitutional 'right to . . . petition government for redress of grievances.' " (*Id.* at p. 578.) However " '. . . a plaintiff must do more than merely allege that a defendant's petitioning activity was a sham in order to overcome the First Amendment privilege. Otherwise, the right to petition without fear of sanctions would become a mockery. The 'sham' exception cannot be used to chill this constitutional right. [Citations.] [Plaintiff], therefore, must allege facts that demonstrate that defendants' complaints . . . were merely a ruse and that defendants were not truly seeking favorable governmental action. . . .' " (*Id.* at. p. 581.) Suffice it to say, neither the objective nor subjective requirements of the sham exception have been met in this case.

## III

Respectfully, I believe the consequences of the majority's holding with respect to the *Currie* claim are staggering.

As I noted at the outset, all government public institutions in this state must conduct themselves within the limits set forth by the people in various

forms, from city charter provisions, such as section 225, to amendments to our state Constitution, such as Proposition 13. As *Rider v. City of San Diego* and *Rider v. County of San Diego* demonstrate, until today those limitations were often the subject of fiercely conflicting interpretations. The majority, however, has gone a long way in eliminating these conflicts: in a very powerful fashion, my colleagues have discouraged citizens from ever arguing with the government over limitations on its powers. Although the *Currie* claims were in no definitive manner barred by either *Rider v. City of San Diego* or the provisions of the city charter, the majority has nonetheless found that in pursuing *Currie* Henderson acted without probable cause. Given this holding it would be pure folly for any citizen or citizens group to challenge any government action. If they are unsuccessful, their opponents will surely ignore the majority's disposition of the *Maillhot III* claim and, relying on the *Currie* holding, seek sanctions and recovery in tort if a private party is involved.

In discouraging citizens from attempting to enforce limitations on government action, I think the majority has made a serious mistake. I would submit that as a general proposition our laws embody the principle that as a people we are far better off with citizens who feel free to challenge government leaders than with government leaders who feel free to ignore the restraints we have placed on them.

A petition for a rehearing was denied January 15, 2004, and the opinion was modified to read as printed above. Benke, J., was of the opinion that the petition should be granted. Appellant's petition for review by the Supreme Court was denied April 14, 2004. Kennard, J., and Moreno, J., were of the opinion that the petition should be granted.