Filed 3/4/13  The Duringer Law Group v.MacMillan CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE DURINGER LAW GROUP, et al., | |
| Plaintiffs and Appellants, | G046637 |
| v. | (Super. Ct. No. 30-2011-00512549) |
| ALAN MACMILLAN, et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from orders of the Superior Court of Orange County, Ronald L. Bauer, Judge.  Affirmed.

The Duringer Law Group, Stephen C. Duringer, Eric J. Bautista, Edward L. Laird II; Law Office of Edward E. Dollar, Edward E. Dollar for Plaintiffs and Appellants.

Hunt & Adams, and John C. Adams III, for Defendant and Respondent Alan MacMillan.

Law Offices of Rex T. Reeves, and Rex T. Reeves, for Defendants and Respondents Chambers, Noronha & Kubota, Gary L. Chambers, Peter A. Noronha, Yoshiaki C. Kubota, and Jonathan Dwork.

The Duringer Law Group, Stephen C. Duringer, and R. Scott Andrews (hereafter referred to collectively and in the singular as DLG, unless the context indicates otherwise), appeal from the order dismissing its malicious prosecution complaint against the respondents after the trial court granted the respondents' special motion to strike the complaint as a strategic lawsuit against public participation (anti-SLAPP motion). (Code Civ. Proc., § 425.16.)[1] The respondents are DLG's former client Alan MacMillan (MacMillan) and his attorneys, the law firm of Chambers, Noronha & Kubota (CNK), and attorneys Gary L. Chambers, Peter A. Noronha, Yoshiaki C. Kubota, and Jonathan Dwork (sometimes collectively referred to as the attorney defendants, unless the context indicates otherwise), who sued DLG for malpractice related to DLG's handling of an unlawful detainer action on MacMillan's behalf. DLG contends the trial court erred by granting the anti-SLAPP motion because it presented sufficient evidence of a probability of prevailing. DLG also challenges the order awarding the respondents their attorney fees as an abuse of discretion. We conclude DLG's contentions are meritless, and we affirm both orders.

FACTS & PROCEDURE

This malicious prosecution action arises out of DLG's representation of MacMillan in an unlawful detainer action against one of his commercial real property tenants, and like the Hydra of mythology, has grown many heads. We begin with background on each piece of litigation the unlawful detainer action has spawned summarized from two prior opinions from this court—*MacMillan v. Andrews et al.* (July 1, 2011, G044208) [nonpub. opn.] (*MacMillan*) and *Munoz v. MacMillan* (2011)

---

[1] Code of Civil Procedure section 425.16 authorizes a special motion to strike a Strategic Lawsuit Against Public Participation (SLAPP) action. Section 425.16 is referred to as the anti-SLAPP statute. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 85, fn. 1.) All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

195 Cal.App.4th 648 (*Munoz*)—supplemented where necessary from the record before us in this appeal.

*1. The Unlawful Detainer Action*

MacMillan owns multi-unit commercial real property in Garden Grove, managed by Kenski Properties, Inc. (Kenski Properties). DLG is the law firm Kenski Properties routinely used to handle evictions on properties it managed. (*MacMillan, supra,* G044208, typed opinion, p. 2.) In 2000, a unit in MacMillan's building was leased to Mill Inn, Inc. (Mill Inn), for use as an Internet café under a lease providing for a term of five years, with an option for two five-year renewal terms. The lease required six-months' advance written notice to exercise the renewal options. The lease also provided that even if the lessor consented to an assignment of the lease, such an assignment would not transfer the renewal options unless the lessor specifically consented to also transfer the renewal options. (*MacMillan, supra,* G044208, typed opinion, p. 3.) In 2003, Mill Inn assigned "'all of its rights, title and interest in and to the lease'" to Concepcion Munoz, who operated a bar on the premises. The written assignment was prepared and signed by Linda Kenski, owner of Kenski Properties, as agent for MacMillan. (*Ibid.*)

The original lease term expired on May 30, 2006 (the lease had been amended once to extend the original term), and Kenski Properties did not want to keep Munoz as a tenant. On June 1, 2006, it served a 30-day notice of termination of tenancy on Munoz. "On June 7, 2006, Munoz's attorney sent a letter to Kenski Properties attaching a copy of a letter dated October 23, 2005, from Munoz addressed to Kenski Properties stating she wanted to exercise her option to renew. The attorney stated Munoz's letter had been mailed to Kenski Properties on October 23, 2005." (*MacMillan, supra,* G044208, typed opinion, p. 3.)

On July 6, 2006, DLG filed the unlawful detainer action for MacMillan (*MacMillan v. Munoz* (Super. Ct. Orange County, 2006, No. 06WL03662)) (the Unlawful

Detainer Action) based on the 30-day notice. On October 20, 2006, the trial court entered judgment for MacMillan and a writ of possession was issued. Munoz appealed but did not seek a stay of the writ of possession. In January 2007, MacMillan recovered possession of the premises and found new tenants. (*MacMillan, supra,* G044208, typed opinion, pp. 3-4.)

In January 2008, the Appellate Division of the Superior Court of Orange County, in an unpublished decision, reversed the unlawful detainer judgment and remanded with directions to enter a judgment in Munoz's favor. (*MacMillan v. Munoz* (Super. Ct. Orange County (2008) App. Div. No. AP14837.) The issues tried it the unlawful detainer trial included whether the renewal option was ever assigned to Munoz and whether she timely exercised the option. As to the former issue, the appellate division concluded the written assignment encompassed the options because it stated Mill Inn was assigning to Munoz all of its rights under the lease. As to the latter issue, the appellate division concluded Munoz had timely exercised her option to renew the lease via the October 25, 2005, letter to Kenski Properties, and MacMillan had not produced sufficient evidence to rebut the Evidence Code section 641 presumption that a letter properly addressed and mailed is received.

On remand, Kenski Properties did not place Munoz back in possession. The trial court awarded her approximately $25,000 in costs and attorney fees against MacMillan. (*MacMillan, supra,* G044208, typed opinion, p. 4.)

*2. Munoz's Breach of Contract Action*

In May 2009, Munoz filed a breach of contract action against MacMillan (the Munoz Breach of Contract Action), alleging MacMillan breached the lease by wrongfully evicting her from the premises. (*Munoz, supra,* 195 Cal.App.4th at pp. 651-652.) By this time, MacMillan was no longer being represented by DLG and had retained CNK as his counsel. Although CNK had already filed MacMillan's separate legal malpractice action against DLG (described below), on August 3, 2009, it filed a

4

cross-complaint for MacMillan against DLG in the Munoz Breach of Contract Action alleging the same causes of action alleged in the legal malpractice action. On October 30, 2009, DLG's demurrer to the cross-complaint was sustained without leave to amend on the ground there was another action pending encompassing the same causes of action.

MacMillan obtained a summary judgment in the Munoz Breach of Contract Action on the theory that Munoz's eviction was not "wrongful" because it was pursuant to a valid and enforceable court order that was acted upon by law enforcement. (*Munoz, supra,* 195 Cal.App.4th at pp. 652-653.) This court reversed the summary judgment concluding Munoz "was entitled to seek compensation for losses she allegedly incurred following enforcement of the erroneous initial judgment in the unlawful detainer action. Munoz could have suffered economic loss as a result of her eviction even if the eviction was not 'wrongful' as a matter of tort law. Munoz's most straightforward remedy was to seek restitution in the underlying unlawful detainer action, not to bring a subsequent action for breach of contract. But the law does not bar Munoz from seeking contract damages in a separate action." (*Id.* at p. 650.)

*3. MacMillan's Legal Malpractice Action*

On December 30, 2008, MacMillan, through the defendant attorneys, filed the underlying legal malpractice action against DLG alleging professional negligence arising out of its representation of MacMillan in the unlawful detainer action (the Malpractice Action). In short, "[MacMillan] alleged [DLG] failed to properly raise, investigate, and litigate issues concerning assignment and exercise of the renewal options and whether the lease also could have been terminated due to Munoz's violation of the lease's use provisions. MacMillan's complaint contained causes of action for legal malpractice and breach of fiduciary duty." (*MacMillan, supra,* G044208, typed opinion, p. 5.) The complaint also alleged causes of action for intentional and negligent infliction of emotional distress.

5

On March 5, 2010, DLG filed a motion for summary judgment/summary adjudication, which was set for hearing May 20, 2010. In its moving papers, DLG presented evidence concerning how it received unlawful detainer cases (five to 10 cases a month) from Kenski Properties, stating the actions were virtually always based upon the notice Kenski Properties had already served on the tenant (e.g., three-day notice to pay rent or quit; 30-day notice to terminate tenancy). Around June 23, 2006, Kenski Properties asked DLG to begin eviction proceedings to evict Munoz from the premises and the case was assigned to DLG associate attorney Andrews. Duringer generally supervised Andrews, but he had no direct involvement in this case. Kenski Properties sent DLG the relevant documents and the 30-day notice it had already prepared and served on Munoz on June 1, 2006, and based on those documents, DLG filed the unlawful detainer action.

DLG asserted that at the time of the Unlawful Detainer Action trial, Kenski Properties had no documentary evidence to show it did not receive Munoz's October 23, 2005, letter exercising her option to renew the lease and had no evidence regarding the processing of mail in its office. Kenski Properties and MacMillan acknowledged Munoz had the option to renew because Linda Kenski sent an e-mail to MacMillan after the unlawful detainer action was filed advising him Munoz had not timely exercised her option to renew. Moreover, in responding to interrogatories propounded by Munoz, Kenski Properties employee Carleen Kezeor answered "No," to the question asking "whether MacMillan contends that Munoz was never granted an option to . . . extend the lease . . . ." (*MacMillan, supra,* G044208, typed opinion, p. 6.)

With regards to allegations DLG failed to adequately investigate potential violations of the lease use restrictions, or to pursue eviction of Munoz on the theory she was not in compliance with lease conditions, or was committing waste or nuisance on the premises, DLG asserted Kenski Properties never served Munoz with notice she must comply with conditions in the lease. It also asserted Kenski Properties did not have

6

sufficient evidence to give notice terminating the tenancy due to failure to comply with lease terms or waste. (*MacMillan, supra,* G044208, typed opinion, p. 7.) Finally, DLG asserted MacMillan could not prove causation or damages.

MacMillan's opposition to the summary judgment motion in the Malpractice Action suffered from several procedural problems with regard to his separate statement of undisputed facts. At his April 28, 2010, deposition MacMillan waived his emotional distress claims (more on that anon), and although he did not amend his pleading, in his opposition he conceded summary adjudication of those causes of action was proper. (*MacMillan, supra,* G044208, typed opinion, p. 5, fn. 2.)

MacMillan contended there were material issues of fact as to his causes of action for professional negligence and breach of fiduciary duty. He included a declaration from Kezeor, Kenski Properties' vice president of administration, regarding complaints she had received about Munoz's customers' behavior around the premises (littering, defecating, and urinating around the buildings and cars, gang activity, threats to other tenants), and she wrote to Munoz about the problems warning her they could constitute a breach of the lease. Kezeor declared she did not receive a copy of the letter dated October 23, 2005, saying Munoz was exercising her option to renew, until *after* she served Munoz with the 30-day notice. Kezeor declared she spoke to Andrews before sending DLG any of the documents pertaining to the Munoz eviction telling him about the potential nuisance issues. She also told Andrews that Kenski Properties had not previously received the October 2005 letter. (*MacMillan, supra,* G044208, typed opinion, pp. 8-9.)

Kezeor declared no one from DLG had discussed the unlawful detainer complaint with anyone from Kenski Properties before it was filed. Andrews did not review Kezeor's responses to special interrogatories propounded by Munoz, including the question, "'Do [you] contend that when [you] consented to the assignment of [Mill Inn's] interest in the [lease], [you] did not consent to [Munoz] being assigned an option to

7

extend . . . [,]'" to which Kezeor replied, "No." Kezeor declared she was the only witness Andrews called at trial and he presented no evidence about nuisance conditions at the premises even though Andrews was given a declaration from another tenant about the conditions. (*MacMillan, supra,* G044208, typed opinion, p. 9.)

MacMillan also submitted a declaration from a litigation attorney with expertise in commercial unlawful detainer actions, who opined Andrews lacked the requisite experience to handle the case, and breached the standard of care by failing to adequately investigate or present evidence concerning Munoz's exercise of the option to renew the lease. (*MacMillan, supra,* G044208, typed opinion, p. 10.)

The trial court granted DLG's motion for summary judgment because of the procedural defects in MacMillan's separate statement. (*MacMillan, supra,* G044208, typed opinion, p. 10.) On appeal, in our opinion filed July 1, 2011, we concluded the trial court abused its discretion by granting the summary judgment motion solely due to procedural defects. However, upon the requisite de novo review, we concluded MacMillan had not carried his burden to demonstrate there were triable issues of fact as to his causes of action—in particular because he had not demonstrated causation, i.e., that but for the alleged negligence, he would have prevailed on the appeal of the unlawful detainer judgment he obtained against Munoz.

There were three issues MacMillan claimed Andrews had botched in the Unlawful Detainer Action: "(1) whether Mills Inn's assignment of the lease to Munoz included assignment of the option terms; (2) whether Munoz timely exercised the options; and (3) whether Munoz was committing waste or maintaining a nuisance in violation of the use provisions of the lease." (*MacMillan, supra,* G044208, typed opinion, p. 18.) As to the first issue, the appellate division of the superior court concluded the plain meaning of the assignment language was that the option terms had been assigned to Munoz, and MacMillan's separate statement contained no objective evidence that an assignment of the options was not intended. (*MacMillan, supra,*

8

G044208, typed opinion, at pp. 19-20.)  As to the second issue, MacMillan claimed Andrews was negligent in failing to present evidence to overcome the presumption of mailing, but he made no showing as to what evidence existed that would have overcome the presumption.  (*MacMillan, supra,* G044208, typed opinion, pp. 20-22.)  And as to the third issue, MacMillan made no showing as to *how* the claimed obnoxious behavior by Munoz's customers violated the lease terms or would have supported her eviction.  (*MacMillan, supra,* G044208, typed opinion, pp. 22-23.)

*4.  DLG's Malicious Prosecution Action*

On October 3, 2011, DLG filed the instant malicious prosecution action (the Malicious Prosecution Action) against the respondents (i.e., MacMillan and the attorney defendants).  The original complaint contained two malicious prosecution causes of action:  one premised on the filing and maintenance of the Malpractice Action and one premised on the filing and maintenance of the cross-complaint in the Munoz Breach of Contract Action.  On December 2, 2011, DLG filed a first amended complaint containing the same allegations, and attaching the same exhibits, but deleting headings for two causes of action and combing all the allegations concerning the Malpractice Action and the cross-complaint in the Munoz Breach of Contract Action into a single malicious prosecution cause of action.

*A.  Anti-SLAPP Motion*

The respondents jointly filed an anti-SLAPP motion contending the Malicious Prosecution Action arose out of protected activity and DLG would not be able to demonstrate a probability of prevailing on the merits, in particular with regards to the probable cause and malice elements of the cause of action.  They additionally asserted the "de facto" second cause of action for malicious prosecution premised on prosecution of the cross-complaint in the Munoz Breach of Contract Action was time-barred.  MacMillan separately asserted he acted on advice of counsel in filing the Malpractice Action, and DLG would not be able to overcome this defense.  The

9

anti-SLAPP motion was accompanied by declarations from the attorney defendants, MacMillan, and employees of Kenski Properties, describing the circumstances surrounding the Unlawful Detainer Action and the Malpractice Action.

*i. Attorneys' Declarations*

Chambers was the attorney who primarily handled the Malpractice Action for MacMillan, and the only attorney in the CNK office involved in filing the Malpractice Action complaint or the cross-complaint in the Munoz Breach of Contract Action. One of his associate attorneys, Dwork, did some work on the matter, but always under Chambers' direction and supervision. The other two attorneys in the office, Noronha and Kubota, had only "de minimis" involvement in the Malpractice Action—one covered for Chambers by appearing at a status hearing and on the motion to tax costs; the other handled processing payment of costs and discovery sanctions awarded to DLG in the Malpractice Action.

Chambers declared the Malpractice Action was referred to his firm by Tom Cummings, the attorney who picked up where DLG left off in handling the Unlawful Detainer matter. Cummings explained to Chambers that although DLG had initially succeeded in the Unlawful Detainer Action, Andrews did such a poor job, failing to rebut defenses or present available evidence, that the judgment could not withstand appeal, and the resulting reversal had left MacMillan responsible for Munoz's costs in the Unlawful Detainer Action and exposed to significant liability in the Munoz Breach of Contract Action. MacMillan, a retired veterinarian, lived primarily in Hawaii and was not intimately involved in management of the property—Kezeor and Linda Kenski were the persons most knowledgeable about the facts. Chambers learned from Kezeor and Linda Kenski that MacMillan was "shocked" about what had happened in the Unlawful Detainer Action—he was "scared, very concerned, worried and fearful" over being left responsible for costs and exposed to significant liability in the Munoz Breach of Contract Action. After discussing the facts about the Unlawful Detainer Action with Kezeor,

10

Linda Kenski, and MacMillan, Chambers was convinced MacMillan had viable claims against DLG. Chambers filed the cross-complaint in the Munoz Breach of Contract Action out of an abundance of caution because the claims were related and he did not want to take a chance of the malpractice claim being deemed a compulsory cross-complaint. The cross-complaint was extremely short-lived—it was dismissed on DLG's demurrer within two months of being filed. Chambers denied he filed or prosecuted the Malpractice Action with malice—he had no feeling of malice or ill will toward any of the defendants in the Malpractice Action.

Attorneys Dwork, Noronha, and Kubota each filed a declaration confirming their limited involvement in the Malpractice Action and denying they had any ill will or feeling of malice towards DLG.

*ii. MacMillan's Declaration*

MacMillan declared he had hired Kenski Properties as his agent to manage the property in 1998. To MacMillan's knowledge, when the Mill Inn lease was assigned to Munoz in 2003, Kenski Properties did not specifically consent to assignment of the options to renew, and at no time did he consent to the renewal options being assigned to Munoz. MacMillan believed the end date for Munoz's lease term was May 30, 2006, with no option to renew. Before expiration of Munoz's lease, Linda Kenski and Kezeor both told him about nuisance-type conditions at the premises, and MacMillan concurred with their recommendation that when the lease term expired, Munoz should not be continued as a tenant.

MacMillan was extremely distressed about what happened after the initial favorable judgment in the Unlawful Detainer Action. First, although Munoz had been evicted and MacMillan thought he was "'in the clear,'" he learned Munoz was pursuing her appeal of the Unlawful Detainer Action and was not told by DLG the appeal was still active until a few days before his brief was due. When he learned Munoz had obtained a reversal of the unlawful detainer judgment, MacMillan was told he had to "'appeal the

11

appeal,'" and Andrews was optimistic the Court of Appeal would reverse.  In March 2008, MacMillan was informed that according to Andrews, "the higher court had refused to hear the 'appeal of the [Unlawful Detainer Action] appeal' and that we were basically out of options."  MacMillan later learned (in the course of the current litigation), that this court refused to review the appellate division's ruling for jurisdictional reasons—the appeal (*i.e., the transfer request*) was not timely filed by DLG—and DLG had billed MacMillan for the untimely appeal and its efforts at obtaining a writ from this court directing the superior court to accept the untimely transfer request.  MacMillan knew Munoz was planning on filing a lawsuit against him seeking $5 million in damages and $1 million in attorney fees.  MacMillan was "seriously frightened and extremely concerned about losing [his] life savings and retirement."

MacMillan was certain DLG had mishandled the Unlawful Detainer Action from the beginning and authorized Kenski Properties to find new counsel to file suit against DLG.  In authorizing the Malpractice Action to be filed, MacMillan was acting on facts and information known to himself and his agents that were provided fully to Chambers, and upon Chambers' advice that he had viable claims.  MacMillan declared that while he was extremely upset about DLG's mishandling of the Unlawful Detainer Action and the disastrous outcome, he did not hold any malicious or other bad feelings against DLG, Duringer, or Andrews.

### iii. *Lewis Kezeor's Declaration*

Lewis Kezeor (Lewis) was employed by Kenski Properties since 2002 and was the person responsible for all mail collection, handling, and distribution; he was also the bookkeeper.  Had Lewis been called as a witness at the Unlawful Detainer Action trial, he would have testified he was the only person who picked up mail from Kenski Properties' post office box or building.  Lewis explained in detail the office procedures for handling incoming mail and was very familiar with how Kenski Properties maintained tenant files.  A letter exercising an option to renew was considered a very

12

important document and would be placed in the tenant file. Had such a letter been received it would have been opened first by Lewis, then distributed by him to Linda Kenski for review, and placed in the tenant file. Lewis declared he had no recollection of himself, Linda Kenski, or Kezeor being out of the office on vacation or sick in late October or early November 2005. Lewis declared he had no recollection of receiving an option renewal letter from Munoz in the fall of 2005, and it was inconceivable that had such a letter ever been received by the office, it would have been lost.

*iv. Carleen Kezeor's Declaration*

Kezeor filed a 26-page declaration accompanied by 29 exhibits (almost 120 pages) relating to the Unlawful Detainer Action and her communications with DLG attorneys—in particular with Andrews. She explained the Mill Inn lease was executed by Linda Kenski on behalf of MacMillan. Linda Kenski signed the consent to assignment of the lease to Munoz, but there was no writing whereby MacMillan specifically consented to assignment of the renewal terms to Munoz. Once the lease was assigned to Munoz, Kenski Properties operated under the belief the lease would expire on May 30, 2006. After Munoz took possession, Kenski Properties began receiving complaints about her bar and the conduct of her customers and "extreme nuisance conditions." There was also a brewing dispute between Munoz and another tenant. On May 22, 2006, Kenski Properties wrote Munoz warning her the problems at the bar constituted a violation of her lease. By the end of May, Kenski Properties and MacMillan decided they wanted Munoz out of the building but knew she would be a problem to evict.

In late May, *before* they sent any kind of notice to Munoz, Kezeor and Linda Kenski called DLG about the situation and spoke directly with Andrews about how they should proceed with the Munoz eviction. Although Andrews was handling this specific case, Kezeor and Linda Kenski understood and believed Duringer was actively supervising him. They specifically told Andrews about the nuisance conditions, that other tenants were threatening to move out because of the conditions, that the lease

13

expired on May 30, 2006, and that they expected Munoz would put up a fight. Andrews advised them to evict by serving a 30-day notice of termination of tenancy upon expiration of the lease, which they did.

On June 2, 2012, after serving Munoz with the 30-day notice, Kezeor received a call from Munoz's daughter who said she and Munoz understood the lease was for a 15-year term. Kezeor explained the five-year lease expired May 30, 2006, and the two five-year options were not assigned to Munoz (just the initial lease term), and even if the options had been assigned, they had not been timely exercised. Munoz's daughter asked if they could exercise the options now; Kezeor told her it was too late. After that telephone conversation, Munoz faxed the letter dated October 2005, stating she was exercising the option to renew. Kezeor declared the letter was not in the tenant file, or any other tenant file, and she was confident no such letter had ever been received by Kenski Properties—i.e., that Munoz had backdated it. Kezeor explained in detail about Kenski Properties' internal mail handling and processing procedures, and Kenski Properties' filing procedures, offering that if such a letter had ever been received by Kenski Properties it would have been in the tenant file. In 16 years at Kenski Properties, there had never been another instance when such an important letter had been lost. Had Kenski Properties received such a letter in October 2005, Kezeor would have remembered it because exercising a five-year renewal option was very significant.

After receiving the faxed letter, Kezeor spoke with Andrews and told him they would have to proceed with the unlawful detainer and it was clearly not going to be a routine case. She told Andrews she believed the letter had been backdated and there was no record of Kenski Properties having received it. She also told Andrews the renewal options had not been assigned to Munoz when the lease was assigned—no one consented to assignment of the renewal options. Andrews assured her everything was under control.

14

DLG filed the Unlawful Detainer Action on July 6, 2006. No one from DLG ever contacted Kenski Properties or MacMillan about the contents of the complaint. No one from DLG ever suggested to Kenski Properties that if Munoz was claiming she had the option to renew and had validly exercised that option, Kenski Properties could start the eviction process over based on the nuisance conditions.

Andrews sent Kezeor Munoz's written discovery requests, which included a question, "Do [you] contend that when [you] consented to the assignment of [the lease], [you] did not consent to [Munoz] being assigned an option to extend the [lease] term?" No one from DLG helped Kezeor with her responses. Kezeor mistakenly answered "No"(the question contained a double negative), when she meant to answer "Yes", i.e., that they contended Munoz did not have an option to renew. Andrews later served Munoz with supplementary responses, changing the response to "Yes" but he allowed the original "No" response to be introduced into evidence at the Unlawful Detainer Action trial.

Kezeor declared she was the only witness Andrews called at the Unlawful Detainer Action trial (other than the person who served the 30-day notice), and he only spoke to her for five to 10 minutes in the hallway to prepare her to testify. Andrews asked no questions and presented no other evidence concerning mail receipt procedures and filing to substantiate Kenski Properties' claim that the October 2005 renewal letter had never been received by Kenski Properties. Andrews made no inquiries into Kezeor's telephone conversation with Munoz's daughter (i.e., asking if Munoz could exercise the option to renew late), which conversation was inconsistent with Munoz's later claim she had exercised the option in 2005. Andrews asked no questions about whether there had been a consent to assignment of the renewal options to Munoz.

Kezeor also detailed the conditions at the premises (fights in the parking lot, vandalism, broken bottles, and patrons urinating, defecating, and engaging in sex acts in the parking lot), and the numerous complaints from other tenants who were threatening

15

to vacate. Andrews was well aware of this information as he had utilized a declaration from one of the unhappy tenants to prevent Munoz from obtaining a stay to prevent her being locked out of the premises while the appeal of the Unlawful Detainer Action judgment was pending.

After the appellate division reversed the unlawful detainer judgment, Kenski Properties authorized DLG to file an appeal (i.e., a request to transfer to the Court of Appeal). Andrews represented to Kenski Properties the appeal had been filed, but this court refused to hear it. DLG submitted several bills to MacMillan relating to the appeal. Kezeor later learned the appellate division refused to accept the request for transfer for filing because the notice was not timely. Moreover, DLG had billed MacMillan $8,000 relating to its unsuccessful petition in this court for a writ of mandate seeking to compel the appellate division to accept the notice of transfer. Kezeor observed MacMillan and his wife were "deeply distressed" about how badly the Unlawful Detainer Action was handled, and about "losing their retirement" when all they were trying to do was get rid of a problem tenant.

Linda Kenski's 26-page declaration was substantially identical to Kezeor's.

B. *Opposition*

DLG's opposition to the anti-SLAPP motion focused exclusively on the attorney defendants' conduct in the Malpractice Action. It detailed various discovery disputes between the attorney representing DLG, Eric Bautista, and the CNK attorneys prosecuting the Malpractice Action. At MacMillan's deposition, it became clear to DLG that MacMillan had little input in the actual preparation of the complaint in the Malpractice Action. The opposition did not address MacMillan's defense that he was relying on the advice of counsel in authorizing the filing of the complaint. The opposition asserted this court's opinion in the Malpractice Action affirming the summary judgment established the Malpractice Action was filed without probable cause.

16

DLG provided declarations from Duringer and Bautista. Duringer's declaration detailed discovery disputes during the Malpractice Action that lead to imposition of sanctions against CNK. He attached excerpts from MacMillan's deposition in which MacMillan indicated he had little personal knowledge of the facts regarding the Unlawful Detainer Action litigation, he did not personally retain DLG, and he testified he was waiving his claims for emotional distress and had not specifically authorized including those causes of action in the Malpractice Action. Duringer declared it was clear MacMillan was personally unaware of most of what CNK was doing with regard to prosecuting the Malpractice Action and he was at most "only peripherally" involved. Duringer's declaration criticized the respondents' moving papers for being focused on "attempt[ing] to re-litigate the [Unlawful Detainer A]ction." He declared attorney Chambers refused to discuss settlement in the Malpractice Action and pointed out the complaint in the Malpractice Action sought damages "in excess of the jurisdictional limits of the . . . court."

Bautista filed his declaration again detailing the discovery disputes in the Malpractice Action. His declaration contained no information concerning the Unlawful Detainer Action. He declared that Chambers and Dwork "never once articulated an interest in settlement" of the Malpractice Action.

DLG's opposition was also accompanied by separate evidentiary objections to the respondents' request for judicial notice and to each of the declarations submitted with the anti-SLAPP motion. All told DLG's evidentiary objections totaled 285 pages containing hundreds of individual objections.

C. *Reply Declarations*

In reply, the respondents submitted additional pages from MacMillan's deposition in which he testified he authorized Chambers to file the complaint in the Malpractice Action. MacMillan filed a supplemental declaration explaining he authorized filing the complaint in the Malpractice Action based on the facts—he declared

17

that when he testified at his deposition that he did not "authorize" the emotional distress causes of action; all he meant was that he did not specifically direct what causes of action would be included in the complaint because he would not have known what were viable causes of action and what were not. When he testified he was "waiving" emotional distress damages, he did not say he did not have emotional distress—only that he did not want to get bogged down in that—he just wanted his economic damages.

CNK employees and attorneys Chambers, Dwork, and Kubota submitted declarations regarding discovery disputes and motions to compel discovery, in the Malpractice Action, and CNK's immediate payment of the minimal sanctions imposed against it.

*D. Ruling*

At oral argument on the anti-SLAPP motion, counsel for the respondents noted DLG's opposition contained no evidence demonstrating they could prevail on the Malicious Prosecution Action in particular because nothing in the opposition addressed whether there was probable cause to file the Malpractice Action, i.e., whether DLG had mishandled the original Unlawful Detainer Action. The respondents submitted extensive evidence supporting their belief DLG mishandled the Unlawful Detainer Action. Counsel also argued DLG made absolutely no reference to MacMillan's advice of counsel defense in its opposition.

In ruling, the trial court began by noting it was beyond dispute the first prong was satisfied—the Malicious Prosecution Action arose out of protected activity. The court then moved on to whether DLG had demonstrated a probability of prevailing. It first separated out the short-lived cross-complaint that had been filed in the Munoz Breach of Contract Action. It concluded DLG had not demonstrated a favorable termination of that cross-complaint, and in any event any claim based upon that pleading was time-barred. The court next explained DLG had not demonstrated a probability of prevailing because it had not demonstrated malice and lack of probable cause. As to

18

malice, the court noted most of DLG's objections were completely irrelevant to the dispositive issues. It overruled DLG's evidentiary objections to the parts of the declarations in which the declarants' stated they had no ill will towards DLG as "the beginning of [the respondents'] showing that there was no malice." The court then explained the only evidence DLG presented was pertaining to the attorney defendants' conduct of discovery in the Malpractice Action but that did not equate to malice. Although the attorney defendants lost some discovery motions, and were ordered to pay sanctions, they immediately complied with those sanction orders—"they played by the rules." There was no evidence the discovery "mishaps" were undertaken with malice—"it's just litigation. That's what happens." The court moved on to probable cause. It observed the fact DLG prevailed on the summary judgment motion did not establish lack of probable cause and the inclusion of the emotional distress claims in the Malpractice Complaint was within the realm of reasonable "good aggressive lawyering."

After the court announced its ruling granting the anti-SLAPP motion, and directed the respondents' attorney to prepare a written order, DLG's counsel asked the court if it ruled on "every single [one]" of DLG's evidentiary objections—almost 300 pages of them. The court reiterated it did not believe it was necessary to rule on all of the objections—it ruled on the relevant ones pertaining to the lack of malice—everything else was "largely really undisputed . . . about the history of the litigation. It's in the records."[2] After granting the respondents' anti-SLAPP motion striking DLG's

---

[2]    DLG's opening brief contains a single sentence vaguely criticizing the trial court for not ruling on each of the evidentiary objections. Assuming the trial court's failure to rule on the objections preserves them for appeal (see *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 531-532 [in summary judgment context, when trial court fails to rule on evidentiary objections, "it is presumed that the objections have been overruled, the trial court considered the evidence in ruling . . . , and the objections are preserved on appeal"]), we nonetheless observe DLG had not raised any specific evidentiary objection on appeal supported by any reasoned analysis.

19

complaint and dismissing the action, the court subsequently awarded the respondents $105,025 in costs and attorney fees.

DISCUSSION

*1. Trial Court Properly Granted Anti-SLAPP Motion*

It is well established that we review a trial court's ruling on an anti-SLAPP motion de novo.[3] (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325-326 (*Flatley*); *Slaney v. Ranger Ins. Co.* (2004) 115 Cal.App.4th 306, 319.) It is also well established that even when we conduct a de novo review, we still must presume the trial court's ruling is correct, and the appellant has the burden of affirmatively demonstrating error. (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1376; *Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 230.)

Section 425.16, subdivision (b)(1), provides, "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

In ruling on an anti-SLAPP motion, the trial court engages in a two-step analysis. First, the defendant must show the activity underlying the cause of action arises from protected activity. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) If so, then the plaintiff must show a likelihood of prevailing on the cause of action. (*Ibid.*) In meeting that burden, "the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of

---

[3] In view of our de novo standard of review, we need not address DLG's argument the trial judge exhibited "overt bias" against it in this case. Moreover, we have reviewed the entire record including the reporter's transcript from the hearing and find DLG's incessant attacks on the intellect, integrity, and impartiality of the trial judge, particularly those contained in its reply brief, completely unwarranted.

20

facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 (*Wilson*), superseded by statute on other grounds as stated in *Hutton v. Hafif* (2007) 150 Cal.App.4th 527, 547.)

A. *Cause of Action Arising from Protected Activity*

DLG concedes a malicious prosecution action is subject to an anti-SLAPP motion. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733 (*Jarrow*); see also *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291; *Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532, 1537; *White v. Lieberman* (2002) 103 Cal.App.4th 210, 221.)[4] Accordingly, we may move directly to the second prong of the analysis—whether DLG satisfied its burden of demonstrating a probability of prevailing on its malicious prosecution action.

B. *Probability of Success*

To meet its burden to establish a prima facie case of malicious prosecution, DLG was required to demonstrate "'"that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations].'"' [Citation.]" (*Brennan v. Tremco Inc.* (2001) 25 Cal.4th 310, 313; *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871 (*Sheldon Appel*).)

 i. *Probable Cause*

The trial court properly granted the anti-SLAPP motion because DLG failed to establish the Malicious Prosecution Action was brought without probable cause.

---

4       Bizarrely, in its opposition papers below, DLG did not concede this point. Despite the clear Supreme Court authority that a malicious prosecution action is by its very nature an action subject to an anti-SLAPP motion, DLG asserted respondents failed to produce any *evidence* to satisfy the "arising out of" prong of the analysis, criticizing them for instead "burden[ing the trial] court with a barrage of irrelevant drivel" pertaining to the Unlawful Detainer Action.

For purposes of the anti-SLAPP statute "[o]ne has probable cause to bring a civil action if his claim is legally tenable, as determined on an objective basis. [Citation.] The issue of whether probable cause exists presents a question of law for the court and requires a determination of whether any reasonable attorney would have considered the action legally tenable in light of the facts known to the underlying plaintiff (or, in this case, the lawyer) at the time the suit was filed. [Citations.] [¶] If any reasonable attorney would have considered the action legally tenable, probable cause is established. [Citation.] This 'lenient standard' for bringing a civil action reflects 'the important public policy of avoiding the chilling of novel or debatable legal claims' and allows attorneys and litigants '"to present issues that are arguably correct, even if it is extremely unlikely that they will win. . . ." [Citation.]' [Citation.] Only those actions that '"any reasonable attorney would agree [are] totally and completely without merit"' may form the basis for a malicious prosecution suit. [Citation.]" (*Padres L.P. v. Henderson* (2003) 114 Cal.App.4th 495, 517 (*Padres*), citing *Wilson, supra,* 28 Cal.4th 811, and *Sheldon Appel*, *supra*, 47 Cal.3d 863; see also *Plumley v. Mockett* (2008) 164 Cal.App.4th 1031, 1047 ["Probable cause is a low threshold designed to protect a litigant's right to assert arguable legal claims even if the claims are extremely unlikely to succeed"].)

Because application of the probable cause standard is generally a question of law, it is reviewed on appeal de novo. (*Padres*, *supra*, 114 Cal.App.4th at p. 517.) In applying this standard, we consider the pleadings and evidence submitted by the parties in a light most favorable to the defendant without weighing the evidence or assessing credibility. (§ 425.16, subd. (b)(2); *Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1402; *Padres*, *supra*, 114 Cal.App.4th at p. 509.) We must "consider both the factual circumstances established by the evidence and the legal theory upon which relief is sought. A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks

22

recovery upon a legal theory which is untenable under the facts known to him."
(*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164-165.) "[P]robable cause to bring an
action does not depend upon it being meritorious, as such, but upon it being *arguably*
tenable, i.e., not so completely lacking in apparent merit that no reasonable attorney
would have thought the claim tenable." (*Wilson*, *supra*, 28 Cal.4th at p. 824.)

### a. MacMillan's Advice of Counsel Defense

Preliminarily, we may easily affirm the order granting the anti-SLAPP
motion as to MacMillan individually because DLG failed to make any attempt to defeat
his advice of counsel defense.

"'Probable cause may be established by the defendants in a malicious
institution proceeding when they prove that they have in good faith consulted a lawyer,
have stated all the facts to him, have been advised by the lawyer that they have a good
cause of action and have honestly acted upon the advice of the lawyer.' [Citations.]"
(*DeRosa v. Transamerica Title Ins. Co.* (1989) 213 Cal.App.3d 1390, 1397-1398;
*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1558.)

MacMillan specifically raised the "advice of counsel" defense in the
anti-SLAPP motion. In his declaration MacMillan stated that in authorizing the
Malpractice Action to be filed, he was acting on facts and information known to himself
and his agents that were provided fully to attorney Chambers, and upon Chambers'
advice that he had viable claims. DLG's opposition to the anti-SLAPP motion did not
even mention MacMillan's advice of counsel defense, let alone contain any admissible
evidence proving MacMillan did not honestly rely on his counsel's advice in filing the
underlying Malpractice Action, or did not state all the facts to counsel. Thus, DLG failed
to make a prima facie showing below that it could defeat that defense. Although the trial
court did not expressly rule on the advice of counsel defense, our review is de novo.

DLG's belated attempt to address the advice of counsel defense for the first
time in its reply brief is too little too late. DLG asserts MacMillan failed to prove the

23

defense. But DLG bore the burden of demonstrating a probability of prevailing, and once the defense was raised by MacMillan, the burden was on DLG to demonstrate the defense did not apply.[5] (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) ¶ 7:1015, p. 7(II)-49 [to demonstrate a "'probability of success on the merits,'" "[p]laintiff must present evidence to overcome any privilege or defense to the claim that has been raised"], citing *Flatley*, *supra*, 39 Cal.4th at p. 323 [on anti-SLAPP motion Civ. Code § 47, subd. (b) "litigation privilege presents a substantive defense plaintiff must overcome to demonstrate probability of success on the merits"].) DLG made no attempt to do so, and thus the anti-SLAPP motion was properly granted as to MacMillan.[6]

---

[5] Following oral argument in this matter, DLG submitted a letter to this court stating it addressed MacMillan's advice of counsel defense in a "surreply" it filed two court days before the hearing on the anti-SLAPP motion. There is nothing in the record indicating DLG obtained trial court permission to file a surreply. Moreover, the surreply mentions the defense only in passing, contains no meaningful analysis of the defense or discussion of admissible evidence proving MacMillan did not in good faith rely on counsel's advice, and does not satisfy DLG's burden.

[6] We may also easily affirm the order granting the anti-SLAPP motion to the extent DLG asserted a separate malicious prosecution cause of action based upon the short-lived malpractice cross-complaint filed against DLG in the Munoz Breach of Contract Action. The cross-complaint was filed on August 3, 2009, and dismissed October 30, 2009, following DLG's successful demurrer because there was another action pending (i.e., the underlying Malpractice Action). DLG's original complaint in this action, filed October 3, 2011, alleged a separate cause of action based on this pleading, but in its first amended complaint, it combined the allegations with those pertaining to the underlying Malpractice Action. The trial court concluded DLG's first amended complaint contained a "de facto" second cause of action based on the cross-complaint. DLG failed to demonstrate a probability of prevailing on that second cause of action because it was time-barred on its face (see *Vafi v. McCloskey* (2011) 193 Cal.App.4th 874, 879-883 [one-year statute of limitations applies to malicious prosecution against attorney]), and DLG failed to demonstrate the dismissal constituted a favorable termination (*LaPena v. Wolfe* (1986) 177 Cal.App.3d 481, 484 [favorable legal termination must reflect merits of the underlying action]). DLG does not challenge this conclusion on appeal.

### b. *The Attorney Defendants*

We turn then to whether DLG met its burden to demonstrate the attorney defendants lacked probable cause to file and prosecute the Malpractice Action. We agree with the trial court that it did not.

#### *(i). The Legal Malpractice and Breach of Fiduciary Duty Cause of Action*

DLG argues it demonstrated the attorney defendants had no probable cause to file the underlying Malpractice Action. We disagree.

DLG relies primarily upon the fact that we affirmed the summary judgment in its favor. DLG may not rely upon our prior opinion affirming the summary judgment in its favor to establish it had a probability of prevailing on its malicious prosecution claim. In *Jarrow, supra,* 31 Cal.4th at page 742, our Supreme Court held, "[t]he entry of summary judgment for the defense on an underlying claim on grounds of insufficient evidence does not establish as a matter of law that the litigant necessarily can 'state[] and substantiate[]' [citation] a subsequent malicious prosecution claim." As *Jarrow* pointed out, "summary judgment on the underlying claim does not establish lack of probable cause as a matter of law" (*ibid.*), and "obtaining summary judgment for the defense on the underlying claim does not necessarily establish the malice element of a subsequent malicious prosecution claim." (*Id.* at p. 743.)

The elements of a cause of action for legal malpractice are: "'(1) the duty of the attorney to use such skill, prudence and diligence as members of the profession commonly possess; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage. [Citations.]' [Citation.]" (*Wiley v. County of San Diego* (1998) 19 Cal.4th 532, 536.) In our prior opinion, we concluded MacMillan failed to present sufficient evidence on causation and damages, i.e., that but for DLG's alleged negligence in handling the Unlawful Detainer Action, the result would have been different. (*MacMillan, supra,* G044208, typed opinion, p. 18.)

25

As noted by the trial court, DLG presented no evidence in opposition to the anti-SLAPP motion concerning its handling of the Unlawful Detainer Action—indeed DLG characterized the respondents' evidence in this regard as being "irrelevant drivel[.]" DLG's evidentiary showing on the anti-SLAPP motion focused almost entirely on the litigation tactics employed by the attorney defendants in the underlying Malpractice Action. On appeal, DLG continues to assert evidence concerning how it handled the Unlawful Detainer Action (particularly the declarations of Kenski Properties personnel Lewis, Kezeor, and Linda Kenski) has no bearing on the probable cause element of its Malicious Prosecution Action. Nonsense.

DLG filed and prosecuted the Unlawful Detainer Action for MacMillan. The underlying Malpractice Action was premised upon the respondents' belief Andrews mishandled the Unlawful Detainer Action resulting in a reversal of the Unlawful Detainer judgment and MacMillan's exposure to costs in the Unlawful Detainer Action, as well as to significant damages in the Munoz Breach of Contract Action. The respondents' believed Andrews and DLG failed to adequately present two issues that were litigated in the Unlawful Detainer Action: whether the renewal options were ever assigned to Munoz and, if so, whether she timely exercised those options. They also believed Andrews and DLG failed to investigate or raise an alternative basis on which Munoz might be evicted: violation of the lease covenants by virtue of her customers' obnoxious conduct in and around the premises.

Although we concluded in our prior opinion MacMillan failed to make an adequate evidentiary showing that would have allowed him to prevail on the malpractice and breach of fiduciary duty causes of action, that does not mean the facts concerning the Unlawful Detainer Action had become irrelevant as to whether there was probable cause to file and prosecute the Malpractice Action or that it was filed and prosecuted with malice. We concluded MacMillan failed to present evidence in opposition to summary

26

judgment creating a material issue of fact as to causation.[7]  But that did not mean the evidence did not exist—only that MacMillan failed to sufficiently present it in the opposition to the summary judgment motion.

For example, on the issue of whether the option terms were assigned to Munoz, we observed the appellate division of the superior court interpreted the plain language of the assignment (Mill Inn assigned "all of its rights, title and interest in and to the [l]ease") to include an assignment of the option terms.  We found MacMillan's opposition included no evidence leading to a different interpretation of the assignment agreement, noting that "[s]ignificantly, MacMillan offered no evidence the assignment was not intended (or at least was not understood by MacMillan and his agent who drafted the assignment) to include the options terms."  (*MacMillan, supra,* G044208, typed opinion, pp. 19-20.)

In their declarations in support of the anti-SLAPP motion, Kezeor and Linda Kenski declared there was no writing specifically consenting to the assignment of the option terms, and they understood Munoz's lease would expire upon the original lease term.  MacMillan declared neither he nor Kenski Properties consented to assignment of the options to renew, and at no time did MacMillan intend for the renewal options to be assigned to Munoz.

Additionally, we observed with regard to Kezeor's response of "No" to the Munoz-propounded interrogatory asking "whether MacMillan contends that Munoz was never granted an option to the [*sic*] extend the lease," that although MacMillan claimed the response was confusing, "nowhere in [Kezeor's] declaration does she state it was not

---

7        In the underlying Malpractice Action, MacMillan conceded his breach of fiduciary duty cause of action was duplicative of his legal malpractice cause of action. (*MacMillan, supra,* typed opinion p. 17.)  In challenging the order granting the anti-SLAPP motion, DLG similarly asserts there was no probable cause to assert the breach of fiduciary duty cause of action for the same reason as the legal malpractice cause of action—no evidence of causation of damages.

27

the answer she intended to give." (*MacMillan, supra,* G044208, typed opinion, pp. 19-20.) In her declaration on the anti-SLAPP motion Kezeor stated it was not the answer she intended (i.e., because the question contained a double negative she answered "No", when she meant "Yes"), and further that Andrews was aware of her erroneous response because he prepared and served a corrected response on Munoz (changing the answer to "Yes").

With regard to the issue of timeliness of Munoz's exercise of the option to renew, in reversing the Unlawful Detainer judgment, the appellate division found MacMillan had not presented sufficient evidence to rebut "the [Evidence Code section 641] presumption a letter properly addressed and mailed is received" and Kezeor's testimony she never *saw* the letter was not relevant to whether it had in fact been *received* in Kenski Properties' office "absent evidence as to how mail was handled in the office (i.e., who opened the mail, how was it processed and filed?)." (*MacMillan, supra,* G044208, typed opinion, p. 20.) Although MacMillan argued attorney Andrews was negligent in not presenting such evidence at the Unlawful Detainer trial, the summary judgment opposition made no offer as to what that evidence was. "MacMillan's opposing papers contain no evidence concerning how mail was received in Kenski Properties office. To prove that 'but for' the attorneys' alleged breach of the standard of care the result on the mailing issue would have been different, MacMillan had to have shown there was in fact evidence from which a trier of fact could have found the presumption of mailing was overcome. The court cannot speculate that such evidence existed." (*MacMillan, supra,* G044208, typed opinion, p. 21.)

In the anti-SLAPP motion, the respondents filled in that evidentiary gap, providing detailed evidence in declarations from Kenski Properties employees, Lewis, Kezeor, and Linda Kenski, as to how mail was received and processed in the office from which a trier of fact could have reasonably concluded Munoz the letter was never received by Kenski Properties. (See *Tremayne v. American SMW Corp.* (1954)

28

125 Cal.App.2d 852 [Evid. Code, § 641 presumption overcome by testimony of office manager about handling of incoming mail and that the letter mailed by defendants had never been received in the office]; see also *Bonzer v. City of Huntington Park* (1993) 20 Cal.App.4th 1474, 1480-1481 [Evid. Code, § 641 presumption overcome by testimony of office employee about who received mail, how mail was routed, no one recalled seeing document, document should be in the files, and diligent search turned up no record of it].) Remarkably, in their opposition to the anti-SLAPP motion, DLG offered no evidence to contradict the factual assertions made in the Kenski Properties employees' declarations. Based on the foregoing, the respondents reasonably believed DLG was negligent in its handling of the Unlawful Detainer Action and had probable cause to file the underlying Malpractice Action, in particular with regard to issues that were tried regarding whether the options were assigned to Munoz and if so whether she timely exercised them. For this reason we need not consider the respondents' arguments concerning whether nuisance-type issues should also have been explored.

    *(ii). The Emotional Distress Causes of Action*

    DLG contends it demonstrated the attorney defendants lacked probable cause to include claims for negligent and intentional infliction of emotional distress in the underlying Malpractice Action. (*Mabie v. Hyatt* (1998) 61 Cal.App.4th 581, 582, 596-597 [litigant who successfully defended against two claims, only one of which was supported by probable cause, could maintain a malicious prosecution action on the second claim].) Again, we disagree.

    DLG contends the emotional distress causes of action were legally untenable because emotional distress damages are not recoverable for legal malpractice. Although that is generally the rule, there are "cases in which the attorney's conduct—while not necessarily intentional or in bad faith—is so reckless and the resulting damage is so foreseeable that imposition of liability is proper." (*Pleasant v. Celli* (1993) 18 Cal.App.4th 841, 854, disapproved on other grounds in *Adams v. Paul*

29

(1995) 11 Cal.4th 583, 591, fn. 4; see e.g., *Holliday v. Jones* (1989) 215 Cal.App.3d 102 [emotional distress damages where attorney's incompetence lead to plaintiff's wrongful conviction and incarceration]; *Betts v. Allstate Ins. Co.* (1984) 154 Cal.App.3d 688, 718 [emotional distress damages where attorney's negligence and breach of fiduciary duties resulted in $500,000 excess judgment against plaintiff putting her through "several years of unnecessary harassment, emotional distress" during which she was "liv[ing] on the edge of a financial volcano"].)

DLG contends the claims were factually untenable because the attorney defendants had no facts suggesting MacMillan had in fact suffered emotional distress and at his deposition in the underlying Malpractice Action, MacMillan waived those claims. Preliminarily, in their anti-SLAPP motion the respondents provided the court with evidence of MacMillan's emotional distress demonstrating there was at least a minimal factual basis for pleading the emotional distress causes of action in the Malpractice Action. Chambers declared he was told by Kezeor and Linda Kenski that MacMillan, a retired veterinarian, was "shocked" about what had happened in the unlawful detainer action—he was "scared, very concerned, worried and fearful" over being left responsible for costs and exposed to significant liability in the Munoz Breach of Contract Action. Kezeor and Linda Kenski confirmed MacMillan was distraught about the turn of events in the Unlawful Detainer Action that left him exposed to significant liability. MacMillan described his significant distress over the results of the Unlawful Detainer Action—he knew Munoz was planning on filing a lawsuit against him seeking $5 million in damages and $1 million in attorney fees and he was "seriously frightened and extremely concerned about losing [his] life savings and retirement." DLG makes much of MacMillan's deposition testimony in which he was unable to produce the kind of objective evidence that would normally support emotional distress claims (e.g., medical records and reports, evidence of physical manifestations of emotional distress), and he waived his emotional

30

distress claims. But that does not equate to proof there was no factual basis for including the claims in his complaint.

Additionally, DLG argues that even after MacMillan waived his emotional distress claims at his deposition, the attorney defendants continued to aggressively pursue the claims rather than dismiss them. (See *Zamos v. Stroud* (2004) 32 Cal.4th 958, 970 [attorney's discovery of information showing claim lacks merit may subject him to liability if he continues to pursue the action].) That is a mischaracterization of the record. MacMillan's deposition was taken April 28, 2010, after DLG's summary judgment motion was filed. MacMillan's opposition to the summary judgment motion was filed May 14, 2010, less than two weeks later, in which he specifically conceded he would not contest summary adjudication of the emotional distress causes of action and the punitive damages claims. The attorney defendants did not continue to pursue the emotional distress claims after MacMillan's deposition and the emotional distress claims were not "so completely lacking in apparent merit that no reasonable attorney would have thought [it] tenable." (*Wilson*, *supra*, 28 Cal.4th at p. 824.)

*ii. Malice*

Even were we to agree with DLG that the attorney defendants lacked probable cause to allege emotional distress causes of action in the Malpractice Action, DLG's opposition failed for another reason—they failed to demonstrate the malice element of the malicious prosecution tort.

As noted in *Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 494 (*Downey*), "The 'malice' element . . . relates to the *subjective intent or purpose* with which the defendant acted in initiating the prior action. [Citation.] The motive of the defendant must have been something other than that of . . . the satisfaction in a civil action of some personal or financial purpose. [Citation.] The plaintiff must plead and prove actual ill will *or* some *improper* ulterior motive. [Citation.]"

31

Here, there is no evidence supporting a finding of malice on the part of the attorney defendants (or MacMillan for that matter) in filing the underlying Malpractice Action. The attorney defendants and MacMillan provided declarations stating they had no ill will or hostility towards DLG. DLG offered no contrary evidence. Rather, DLG asserts malice should be inferred from the lack of probable cause. "Merely because the prior action lacked legal tenability, as measured objectively . . . *without more*, would not logically or reasonably permit the inference that such lack of probable cause was accompanied by the actor's subjective malicious state of mind." (*Downey*, *supra*, 66 Cal.App.4th at p. 498, cited with approval in *Jarrow*, *supra*, 31 Cal.4th at p. 743.) "To infer malice from the evidence supporting lack of probable cause, the parties' prefiling behavior must have been clearly unreasonable. The *degree* of unreasonable behavior necessary to support an inference of malice often creates confusion and unnecessary litigation. . . . ' . . . [T]his result [inference of malice] is *not* automatic. To complete proof of malicious prosecution, the presence of malice must be found as a matter of fact. As a consequence, it always remains a *possibility* that unreasonable behavior in terms of the nature of the prefiling behavior of the attorney, even though it would support a conclusion that there was no probable cause to file, would nevertheless *not* support an inference of malice. . . . Thus, in a given case, unreasonable behavior which could lead to a determination that there was a lack of probable cause to file, might not provide a sufficient basis to infer malice, and without malice no case of malicious prosecution can be proved.' [Citation.]" (*Grindle v. Lorbeer* (1987) 196 Cal.App.3d 1461, 1465-1466.)

DLG argues the attorneys' discovery tactics in the course of the Malpractice Action demonstrate malice. We disagree. DLG points to two discovery mishaps in the underlying Malpractice Action both of which resulted in modest sanctions against the attorney defendants: DLG's motion to compel further responses to interrogatories was granted and the attorney defendants were ordered to pay $269.50 in

32

sanctions; DLG's motion to compel MacMillan to appear for deposition in Orange County (MacMillan resided primarily in Hawaii) was granted and the attorney defendants ordered to pay $98 in sanctions. There is nothing suggesting those discovery disputes were unusual. The attorney defendants timely paid the ordered sanctions, and they certainly do not support an inference of malice. Nor can the fact the attorney defendants' did not formally dismiss the emotional distress claims after MacMillan's deposition support an inference of malice given that less than two weeks later they expressly agreed summary adjudication on those claims was appropriate.[8] In short, DLG failed to meet its burden to demonstrate the attorney defendants (or MacMillan) acted with malice and the anti-SLAPP motion was properly granted.

2. *No Abuse of Discretion in Awarding Attorney Fees*

DLG challenges the reasonableness of the amount of attorney fees awarded to the respondents. The respondents counter that we lack jurisdiction to consider the challenge. We conclude we have jurisdiction, but we reject DLG's challenge to the amounts awarded.

A. *Background*

The order granting the respondents' anti-SLAPP motion and dismissing DLG's complaint was entered February 3, 2012. The order included that "[the respondents] are entitled, upon noticed motion, to an award of attorney fees and costs pursuant to . . . 425.16[, subdivision] (c)."

On March 2, 2012, the respondents filed a joint motion for attorney fees, set for hearing on March 26, 2012. CNK's sought attorney fees of $127,617; MacMillan sought attorney fees of $17,062. CNK's trial counsel, Rex T. Reeves, submitted his

---

[8] DLG also accused the attorney defendants of including the emotional distress causes of action in the Malpractice Action to coerce DLG into settlement—that argument is of course directly contradicted by Duringer's and Bautista's declarations criticizing CNK for refusing to discuss settlement of the Malpractice Action.

33

declaration in support of the motion. He detailed his educational background and experience. Reeves explained his standard billing rate was $350 per hour, although in this matter he was only billing CNK $250 with the understanding that if there was "any excess award" of costs and fees it would be paid directly to Reeve's office. Reeves detailed the hours he spent in connection with the anti-SLAPP motion, 336.05 hours in total, and provided invoices detailing those hours, which at his normal billing rate of $350 totaled $117,617.50. Reeves additionally detailed the time spent in preparing the attorney fees motion, another 28.57 hours at $350 per hour, a total of $9,999.50, or a grand total of $127,617. MacMillan's trial counsel, John C. Adams, submitted his declaration detailing MacMillan's attorney fees request also supported by invoices. His standard billing rate was $350 (although as of January 1, 2012, it had increased to $450), he had spent a total of 45.25 hours reviewing and assisting on the joint anti-SLAPP motion and another 3.5 hours on the joint attorney fees motion—which at his rate of $350 totaled $17,062.50.

On March 9, 2012, DLG filed its notice of appeal from the court's February 3, 2012, order granting the anti-SLAPP motion.

On March 13, 2012, DLG filed its opposition to the respondents' motion for attorney fees. Although DLG did not challenge the reasonableness of Reeves's and Hunt's $350 an hour billing rate, it argued the hours the attorneys spent (in particular Reeves's) should be substantially reduced because most of the hours related to time spent reviewing the Unlawful Detainer Action and the Malpractice Action and "relitigating" them in the context of the anti-SLAPP motion.

The attorney fees motion was heard on March 26, 2012. The court concluded there was significant repetition in the tasks performed by the respondents' attorneys in preparing the anti-SLAPP motion. On April 2, 2012, the court entered its order awarding CNK $85,000 in attorney fees, MacMillan $16,000 in attorney fees, plus total costs of $3,525. DLG did not file a separate appeal from the attorney fees order.

34

*B. Appealability*

The respondents contend we lack jurisdiction to consider DLG's challenge to the attorney fees award because it did not separately appeal that order. As a general matter, "[a] postjudgment order awarding attorney fees is separately appealable," and "failure to appeal an appealable order ordinarily deprives the appellate court of jurisdiction to review the order." (*R. P. Richards Inc. v. Chartered Construction Corp.* (2000) 83 Cal.App.4th 146, 158; *Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611, 632 [in the SLAPP context].) A notice of appeal merely from a "'judgment . . . and certain other rulings and orders'" is generally inadequate to challenge a later order regarding the amount of attorney fees. (*Soldate v. Fidelity National Financial, Inc.* (1998) 62 Cal.App.4th 1069, 1074-1075.) There is an exception, however, when a judgment expressly recognizes an *entitlement* to attorney fees (as it did in this case), but the *amount* is left for later determination. As the courts have observed, "requiring a separate appeal from [the fee] order when the judgment expressly makes an award of costs and/or fees serves no apparent purpose." (*Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 997, italics omitted.) In such a case, a notice of appeal from the judgment "challenges the appropriateness of awarding fees" and puts the respondents "on notice that appellants are seeking review of the award." (*Ibid*.; cf. *Silver v. Pacific American Fish Co. Inc.* (2010) 190 Cal.App.4th 688, 693 [where judgment refers to award of attorney fees but record reflects *entitlement* was actually adjudicated at the postjudgment hearing, separate appeal required].)

*C. Reasonableness of Attorney Fees*

DLG challenges the reasonableness of the attorney fees awarded. "The award of defendant's attorney fees, recoverable under section 425.16, subdivision (c), is subject to review under established rules. 'The reasonableness of attorney fees is within the discretion of the trial court, to be determined from a consideration of such factors as the nature of the litigation, the complexity of the issues, the experience and expertise of

35

counsel and the amount of time involved. [Citation.]' [Citations.] The trial court possesses personal expertise in the value of the legal services rendered in the case before it. [Citation.] On appeal, a fee award is reviewed for abuse of discretion." (*Russell v. Foglio* (2008) 160 Cal.App.4th 653, 661.)

"'"While the concept 'abuse of discretion' is not easily susceptible to precise definition, the appropriate test has been enunciated in terms of whether or not the trial court exceeded '"the bounds of reason, all of the circumstances before it being considered. . . ."' [Citations.]" [Citation.] "A decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' [Citations.] In the absence of a clear showing that its decision was arbitrary or irrational, a trial court should be presumed to have acted to achieve legitimate objectives and, accordingly, its discretionary determinations ought not be set aside on review." [Citation.]' [Citation.]" (*Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1249-1250 (*Maughan*).) Further, a trial court's attorney fees award will not be set aside "absent a showing that it is manifestly excessive in the circumstances." (*Children's Hospital & Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 782.)

DLG first complains the court failed to adequately articulate its methodology for making the award. "The amount of an attorney fee award under the anti-SLAPP statute is computed by the trial court in accordance with the familiar 'lodestar' method. [Citation.] Under that method, the court 'tabulates the attorney fee touchstone, or lodestar, by multiplying the number of hours reasonably expended by the reasonable hourly rate prevailing in the community for similar work. [Citations.]' [Citation.]" (*Cabral v. Martins* (2009) 177 Cal.App.4th 471, 491.) "In awarding fees the trial court is not constrained by the amount sought by the successful moving parties [citation], but is obligated to award 'reasonable attorney fees under section 425.16 [that] adequately compensate [] them for the expense of responding to a baseless lawsuit.'

36

[Citations.]" (*Jackson v. Yarbray* (2009) 179 Cal.App.4th 75, 92.) Accordingly, in making its award, the trial court may adjust the request up or down depending on circumstances. (*EnPalm, LLC v. Teitler* (2008) 162 Cal.App.4th 770, 774.)

While acknowledging the trial court utilized the lodestar method, DLG argues there was no evidence of the "unadorned lodestar figure used by the court." To the contrary, there was detailed evidence in the form of declarations and billing invoices from Reeves and Adams. DLG also complains there is no evidence relating to any of the factors considered by the trial court in reducing the award. But given that court reduced the requested award, we fail to see how DLG was prejudiced. Moreover, the trial court explained why it was reducing the fees from the original request—there were redundant items.

Other than its general assertions the amounts awarded were simply too much, DLG makes the following specific assertions. It argues the respondents' 40-page moving memorandum was excessive and unnecessary and the respondents should not have needed more than seven to eight pages and should not have spent more than 40 hours total in bringing the anti-SLAPP motion. But DLG's argument in this regard is based on its erroneous belief evidence and analysis regarding the prosecution of the Unlawful Detainer Action was of no relevance—a point we have already rejected. DLG also asserts that legal work Reeves and Adams did to familiarize themselves with the underlying Malpractice Action that can be traced to CNK's discovery abuses and DLG's motions to compel should not have been allowed, i.e., time Reeves and Adams spent reviewing DLG's various discovery motions, because CNK lost those motions. But in view of the fact DLG was relying almost exclusively upon the discovery wrangling between the attorneys in the Malpractice Action to demonstrate lack of probable cause and malice, the work was reasonable.

This was a heavily litigated matter, with a very large record encompassing three different pieces of litigation (the Unlawful Detainer Action, the Munoz Breach of

37

Contract Action, and the underlying Malicious Prosecution Action) and three different appellate proceedings. The trial court was in the best position to determine whether the fees sought were reasonable. DLG has not demonstrated it abused its discretion.

*3. Attorney Fees on Appeal*

The respondents request their attorney fees on appeal. They are entitled to those fees under the statute. (*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 785.)

## DISPOSITION

The order granting the anti-SLAPP motion and the attorney fees order are affirmed. The respondents shall recover their attorney fees and costs on appeal, the amount of which shall be determined by the trial court.

O'LEARY, P. J.

WE CONCUR:

MOORE, J.

FYBEL, J.